STATE of Wisconsin, Plaintiff-Respondent,

v.

Richard K. FISCHER, Defendant-Appellant.†

Court of Appeals

*No. 02–0147–CR. Oral argument November 12, 2002.—Decided December 18, 2002.*

## 2003 WI App 5

(Also reported in 656 N.W.2d 503.)

† Petition to review denied 4-22-03.

800

On behalf of the defendant-appellant, the cause was submitted on the brief of and oral argument by *Mark S. Rosen* of *Rosen and Holzman*, Waukesha.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Sally L. Wellman*, assistant attorney general, and *James E. Doyle*, attorney general. There was oral argument by *Sally L. Wellman*, assistant attorney general.

Before Nettesheim, P.J., Anderson and Snyder, JJ.

¶ 1. SNYDER, J. Richard K. Fischer appeals from a judgment of conviction for burglary as a party to a crime, contrary to WIS. STAT. §§ 943.10(1)(a) and 939.05(1) (1999–2000).[1] Fischer argues that the trial court erred in denying his suppression motion because he was never read his *Miranda*[2] rights prior to the taking of his statements, that he unequivocally asserted his right to an attorney and that the detective's conversation with him was the functional equivalent of interrogation. We conclude that Fischer's request for an attorney was equivocal and ambiguous. Further, we conclude that the ensuing conversation between him and police detectives was not the functional equivalent of interrogation. We therefore affirm the judgment of conviction.

## FACTS

¶ 2. In January 1999, while Fischer was in custody in Milwaukee county on other matters, he was being investigated for two burglaries in Brookfield, Wisconsin, at F&F Tire World and Goodyear Tire. On January 28, 1999, detective Tom Vento and another detective from the City of Brookfield Police Department

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

arrived at an interview room at the Milwaukee county jail to interview Fischer. Vento identified himself and the other detective to Fischer and explained to him that they were there to talk to him about the Brookfield burglaries. Fischer said that Vento was the third or fourth police department to talk to him that day and he was not interested in accepting anything Vento had to say as truthful. Fischer indicated he was distrustful and skeptical of the police. Fischer explained that he was skeptical because Vento could not authorize or endorse any type of deal for him whereby the Brookfield and Milwaukee county cases would be combined. Vento informed Fischer that a deal to consolidate the Brookfield and Milwaukee county cases "wasn't going to happen" and that Vento wanted to talk to Fischer about the Brookfield cases.

¶ 3. Vento then asked Fischer if he would be willing to talk about the Brookfield cases; Fischer responded that if the officers read him his rights, he would not answer any questions and would request an attorney. Fischer said he was not sure the detectives could work out a deal for him and he did not want "to say anything that's going to get [him] in trouble until [he] find[s] out what's going on."

¶ 4. Because Vento felt the interview was "likely going to come to a very quick close," he explained to Fischer the position of the Brookfield police department. Vento informed Fischer that he was investigating two burglaries based upon evidence taken from Fischer's footwear; after preliminary comparisons of the footwear he was wearing on the night he was arrested in Milwaukee county and evidence taken from the scene of the Brookfield crimes, Vento was "fairly confident" Fischer was responsible for the burglaries and "it shouldn't become a surprise to him" if he were

805

charged in Waukesha county for these burglaries. Fischer then began to ask Vento questions about the specifics of the burglaries.

¶ 5. Fischer asked Vento where the Brookfield police had found his shoe prints. Vento told Fischer that at Goodyear, there was an impression of a shoe where the plexiglass had been kicked in. Fischer then called Vento a liar, stating that the plexiglass was never kicked in but, in fact, had been pushed in with his hand and that the footwear impression would have come from his shoe when he stepped inside the building. Vento then told Fischer he was not sure whether the plexiglass had been kicked in or stepped on but only knew there was a footwear impression similar to his shoes that would be sent to the crime lab for a comparison.

¶ 6. Fischer then asked Vento what had been reported missing from the burglaries. Vento informed Fischer that some property had been taken from a car parked in the parking lot and from inside Goodyear, including a television and some stereo equipment. Vento then explained to Fischer that if Fischer was responsible for the crimes, "what typically helps in these types of cases . . . is to make victims feel less like victims. And one of the ways to do that is to get some of the property back." Fischer denied responsibility for the property taken from the car and then asserted that, hypothetically, if he were responsible, he would not be able to return any of the property because it would have been sold for drugs. Fischer further stated that a second person had been there.

¶ 7. Fischer then asked what had been reported missing from the burglary at F&F Tire World. Vento informed Fischer that some tools had been reported stolen. Fischer responded, saying he doubted that the person reporting the crime was being truthful because

no tools were taken, that "he had all of his own tools with the receipts and could show a proper purchase, and he had no reason to take tools."

¶ 8. Vento and Fischer then talked extensively about Fischer's drug habit and how Fischer was hoping to get some help for this out of the criminal proceedings. At several points during the meeting, Vento told Fischer that since he had already provided some information, he should just "get a statement on the record and put this to rest." Fischer then expressed concern for being treated fairly and declined to provide an official statement; Fischer did not want his rights read to him because he would then ask for an attorney. Fischer also indicated he was tired of talking, he wanted to consult with an attorney and he wanted Vento to come back the next day. Fischer named an attorney and asked to call Vento the following day. Vento informed Fischer that "if he made a phone call it wouldn't be accepted because our building doesn't accept collect calls and that if he wanted to continue this he should have the attorney call."

¶ 9. Near the end of the conversation, Fischer also indicated that during the Goodyear burglary, he saw an officer responding as he was leaving. Vento asked Fischer what he was referring to and Fischer indicated that at Goodyear, he had seen a female officer coming across Bluemound Road from Brookfield Square shopping mall. Vento informed Fischer that he would be notified of any referral of charges, that the detectives might come back to see him or that Fischer's attorney should call them. The entire meeting took about an hour and one-half and during that entire time Fischer was never advised of his *Miranda* rights.

¶ 10. On October 18, 1999, Fischer was charged with two counts of burglary as a party to a crime.

Fischer filed a motion to suppress the statements he provided to Vento, alleging that he was not properly provided with his *Miranda* warnings. The suppression motion was denied.

¶ 11. On September 7, 2000, Fischer pled no contest to the Goodyear burglary and the other burglary count was dismissed and read-in for sentencing. On November 9, 2000, Fischer was sentenced to eighteen months in prison, consecutive to any other sentences, and was denied sentence credit. Fischer appeals.

## DISCUSSION

¶ 12. The first issue before us concerns the sufficiency of Fischer's invocation of the right to counsel. This is a question of constitutional fact we review under a two-part standard. *State v. Jennings*, 2002 WI 44, ¶ 20, 252 Wis. 2d 228, 647 N.W.2d 142. We must uphold the trial court's findings of historical or evidentiary fact unless they are clearly erroneous. *Id.* However, we independently review the trial court's application of constitutional principles to those facts. *Id.* The legal sufficiency of a defendant's invocation of the right to counsel is determined by the application of a constitutional standard to historical facts. *Id.* at ¶ 25.

¶ 13. Fischer argues that when he told the police that if they read him his rights, he would not answer any questions and would request an attorney, he was clearly and unequivocally demanding an attorney. We disagree.

¶ 14. The constitutional standards applicable to the case at hand originate from *Miranda v. Arizona*, 384 U.S. 436 (1966), *Edwards v. Arizona*, 451 U.S. 477 (1981), and *Davis v. United States*, 512 U.S. 452 (1994),

and were thoroughly discussed in *Jennings*, 2002 WI 44 at ¶¶ 26–36. In *Miranda*, the United States Supreme Court recognized the right to the presence of counsel during custodial interrogation to safeguard the right against compulsory self-incrimination under the Fifth and Fourteenth Amendments. *Jennings*, 2002 WI 44 at ¶ 26.

¶ 15. In *Edwards*, the Supreme Court held that the police must immediately cease questioning a suspect who clearly invokes the *Miranda* right to counsel. *Jennings*, 2002 WI 44 at ¶ 26. The *Edwards* Court concluded that "it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Jennings*, 2002 WI 44 at ¶ 26 (citing *Edwards*, 451 U.S. at 485). While the *Edwards* Court recognized "a bright-line, no-further-questioning rule applicable to clear and unequivocal requests for counsel during custodial interrogation, it did not address the subject of requests for counsel that were not so clear and unequivocal. Thirteen years later it did so, in *Davis*." *Jennings*, 2002 WI 44 at ¶ 27.

¶ 16. In *Davis*, the Supreme Court held that a suspect must clearly and unambiguously request counsel in order for the *Edwards* rule to apply. *Jennings*, 2002 WI 44 at ¶ 29. "If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* (citing *Davis*, 512 U.S. at 459).

¶ 17. The *Davis* Court emphasized that this inquiry is an objective one. *Jennings*, 2002 WI 44 at ¶ 30.

"Although a suspect need not 'speak with the discrimination of an Oxford don,' he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* (citing *Davis*, 512 U.S. at 476). Any lower standard would alter *Miranda* safeguards into entirely illogical impediments to legitimate police investigative activity. *Jennings*, 2002 WI 44 at ¶ 30.

¶ 18. The *Davis* Court declined to extend *Edwards* to require officers to stop questioning a suspect when he or she makes any reference to an attorney and further refused to require officers to ask clarifying questions to resolve an ambiguous reference to counsel. *Jennings*, 2002 WI 44 at ¶ 31. While recommending clarification as good police practice, the *Davis* Court was "unwilling to create a third layer of prophylaxis to prevent police questioning when· the suspect *might* want a lawyer." *Jennings*, 2002 WI 44 at ¶ 31 (citing *Davis*, 512 U.S. at 461). In *Davis*, during the course of questioning, the defendant stated, "Maybe I should talk to a lawyer"; the *Davis* Court ruled that this was not a clear and unequivocal request for counsel. *Jennings*, 2002 WI 44 at ¶¶ 28, 31 (citing *Davis*, 512 U.S. at 462).

■

¶ 19. Applying *Davis* and *Jennings* here, we conclude that Fischer's statement to detectives that if the officers read him his rights he would not answer any questions and would request an attorney is sufficiently ambiguous or equivocal such that a reasonable officer in light of the circumstances would have understood only that Fischer *might* be invoking the right to counsel. *See Jennings*, 2002 WI 44 at ¶ 36. Fischer's request was conditional, as it depended upon something that had not yet happened but might happen in the future. His

*Miranda* rights had not yet been read to him and thus he was not yet requesting counsel. A conditional and futuristic request for counsel is a statement that a reasonable officer in light of the circumstances would have understood only that Fischer *might* be invoking the right to counsel, *see Jennings*, 2002 WI 44 at ¶ 36, and thus is not a clear and unequivocal request for counsel.

¶ 20. Which circumstance logically leads to the next question: were the detectives required to read Fischer his *Miranda* rights? Fischer argues that Vento's conversation with him was the functional equivalent of interrogation because Vento's purpose was to obtain information. Fischer argues that because this was a custodial interrogation and he was not read his *Miranda* rights, any incriminating statements were involuntary and therefore should have been suppressed. We disagree and conclude that the conversation was not the functional equivalent of interrogation requiring the reading of *Miranda* rights.

¶ 21. The Fifth Amendment to the federal Constitution provides that no "person . . . shall be compelled in any criminal case to be a witness against himself." *State v. Cunningham*, 144 Wis. 2d 272, 276, 423 N.W.2d 862 (1988). In *Miranda*, the Supreme Court established that the State may not use a suspect's statements stemming from custodial interrogation unless the State demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Cunningham*, 144 Wis. 2d at 276. Included among those safeguards are the now-familiar *Miranda* warnings. *Cunningham*, 144 Wis. 2d at 276.

¶ 22. Determining whether a custodial interrogation occurred is the first step in determining whether

statements were obtained in violation of *Miranda* because *Miranda* warnings need only be administered to individuals who are subjected to custodial interrogation. *State v. Armstrong*, 223 Wis. 2d 331, 344–45, 588 N.W.2d 606 (1999). The State must establish by a preponderance of the evidence whether a custodial interrogation took place. *Id.* at 345.

¶ 23. Custodial interrogation generally means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way. *State v. Hockings*, 86 Wis. 2d 709, 716, 273 N.W.2d 339 (1979). Here, it is undisputed that Fischer was in custody at the time of the meeting between him and the detectives. The question remaining, then, is whether Fischer was interrogated by the detectives.

¶ 24. The United States Supreme Court clarified *Miranda* in *Rhode Island v. Innis*, 446 U.S. 291 (1980), by further defining "interrogation." *Cunningham*, 144 Wis. 2d at 276. The *Innis* Court held that interrogation includes not only express questioning of a suspect but also conduct or words that are the "functional equivalent" of express questioning. *Cunningham*, 144 Wis. 2d at 277. An accused may be interrogated without a single question by police. *State v. Price*, 111 Wis. 2d 366, 372, 330 N.W.2d 779 (Ct. App. 1983).

¶ 25. The generally accepted statement of the *Innis* test is that the "functional equivalent" of express questioning is "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Cunningham*, 144 Wis. 2d at 278 (citing *Innis*,

446 U.S. at 301). This language implies an objective foreseeability test, i.e., whether an objective observer could foresee that the officer's conduct or words would elicit an incriminating response. *Cunningham*, 144 Wis. 2d at 278. Said another way, could the police officer's conduct or speech have reasonably had the force of a question on the suspect? *Id.*

■■■

¶ 26. The *Innis* Court qualified the objective foreseeability standard by stating that "any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect." *Cunningham*, 144 Wis. 2d at 278 (citing *Innis*, 446 U.S. at 302 n.8). An officer's specific knowledge about the suspect may indicate that the officer should have known his or her conduct or words would have had the force of a question on the suspect. *Cunningham*, 144 Wis. 2d at 278.

■■■

¶ 27. Thus, the *Innis* test reflects both an objective forseeability and the police officer's specific knowledge of the suspect. *Cunningham*, 144 Wis. 2d at 278. The *Innis* test can be summarized as follows: if an objective observer (with the same knowledge of the suspect as the police officer) could, on the sole basis of hearing the officer's remarks or observing the officer's conduct, conclude that the officer's conduct or words would be likely to elicit an incriminating response, that is, could reasonably have had the force of a question on the suspect, then the conduct or words constitutes interrogation. *Cunningham*, 144 Wis. 2d at 278–79.

¶ 28. Again, on appeal the trial court's findings of evidentiary or historical fact will not be upset unless they are clearly erroneous. *Id.* at 281–82. The determination of whether the facts of the case satisfy the legal standard articulated in *Innis* is a question of law we review independently of the trial court. *Cunningham*, 144 Wis. 2d at 282.

¶ 29. Here, there is nothing in the record to indicate that the detectives had any specific knowledge of Fischer or of any unusual susceptibility to questioning he might have had. The detectives entered the room, identified themselves, and explained to Fischer that they wanted to talk to him regarding the Brookfield burglaries. Fischer indicated he had talked to police all day and was skeptical and distrustful of the detectives. Fischer said he wanted to arrange some sort of deal to consolidate the Brookfield burglaries and the Milwaukee charges. Vento informed Fischer that a deal was not going to happen and that he wanted to talk to him about the Brookfield burglaries.

¶ 30. Fischer then informed Vento that if the detectives read him his rights, he would not answer any questions and would request an attorney. Vento felt the interview was going to end and as he was preparing to leave, he told Fischer there was sufficient evidence to charge him, specifically Fischer's shoe print at the scene of one of the burglaries, and "it shouldn't become a surprise to him" if he were charged in Waukesha county.

¶ 31. Fischer then began to ask Vento questions about the specifics of the burglaries. Fischer asked how the police obtained his shoe prints; Vento told Fischer that at Goodyear, there was an impression of a shoe where plexiglass had been kicked it. Fischer then denied kicking the plexiglass in but instead asserted that

he had pushed the plexiglass in and the foot impression must have come from his shoe when he stepped inside.

¶ 32. Fischer then asked what had been reported missing. Vento informed him a television, some stereo equipment and some tools. Fischer then denied taking the tools and stated that, hypothetically, he would not be able to return any of the stolen property because it had been sold for drugs. Despite being asked several times, Fischer declined to provide an official statement or put anything on the record.

¶ 33. In essence, the entire exchange consisted of Fischer asking Vento about the evidence against him, and Vento merely responding to Fischer's questions, after which Fischer would implicate himself.

¶ 34. *Innis* did not adopt a per se rule that whenever a law enforcement officer confronts a suspect with incriminating evidence, or verbally summarizes the State's case against the suspect, the officer engages in the functional equivalent of express questioning. *Cunningham*, 144 Wis. 2d at 282. The decision in each case turns upon the facts of each case. *Id.* at 274 n.1.

¶ 35. We must keep in mind the purpose of *Miranda* and *Innis*; these decisions were designed to prevent law enforcement officers from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment. *Cunningham*, 144 Wis. 2d at 283. Vento's conduct and words in this case do not implicate this purpose.

¶ 36. We conclude that under the unusual circumstances of this case, Vento's words and conduct in merely responding to Fischer's questions regarding the evidence against him in the two robberies are not

interrogation under the *Innis* test. We conclude that an objective observer would not, on the sole basis of hearing Vento's words and observing his conduct, conclude that Vento's answers to Fischer's direct questions about the evidence against him would be likely to elicit an incriminating response from Fischer.

¶ 37. However, near the end of the exchange, Vento did admittedly engage in express questioning of Fischer when he asked him about seeing a female police officer as Fischer was leaving Goodyear. The State concedes that Fischer's response, that he had seen a female police officer coming across Bluemound Road, was in direct response to Vento's question and should have been suppressed. However, we conclude that the failure to suppress this statement was harmless error.

¶ 38. The test for harmless error is "whether there is a reasonable possibility that the error contributed to the conviction. A reasonable possibility is a possibility sufficient to undermine our confidence in the conviction." *State v. Jones*, 2002 WI App 196, ¶ 49, 257 Wis. 2d 319, 651 N.W.2d 305 (citation omitted). In making this determination, we must consider the entire record. *Id.*

¶ 39. Fischer's statement, provided in response to a direct question from Vento, came near the end of Vento and Fischer's encounter; prior to that statement, Fischer had made many incriminating statements, none of which were provided during express questioning or its functional equivalent. Fischer asked how the police obtained his shoe prints. After receiving a response to the question, Fischer admitted he had pushed the plexiglass in and the foot impression must have come from his shoe when he stepped inside. Fischer

then asked what property had been reported missing and after receiving a response to his question, denied taking some of the property, thereby implicitly incriminating himself with regard to the remaining property. In addition, Fischer informed Vento that, hypothetically, he could not return any of the stolen property because it had been sold for drugs.

¶ 40. The failure to suppress Fischer's one comment about seeing the female officer was harmless error. We conclude that there is no reasonable possibility that the error contributed to the conviction. There was sufficient evidence to convict Fischer absent this statement.

## CONCLUSION

¶ 41. We reject Fischer's arguments that he unequivocally asserted his right to an attorney and the detective's conversation with him was the functional equivalent of interrogation, concluding that Fischer's request for an attorney was equivocal and ambiguous and that the ensuing conversation between him and police detectives was not the functional equivalent of interrogation. We therefore conclude that the trial court properly denied the suppression motion. We affirm the judgment of conviction.

*By the Court.*—Judgment affirmed.