STATE of Wisconsin, Plaintiff-Respondent,

v.

Brian I. HARRIS, Defendant-Appellant.†

Court of Appeals

*No. 2014AP1767–CR. Submitted on briefs November 10, 2015.—Decided December 30, 2015.*

2016 WI App 2

(Also reported in 874 N.W.2d 602.)

† Petition for Review Filed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Kathleen M. Quinn*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *David H. Perlman*, assistant attorney general, and *Brad D. Schimel*, attorney general.

Before Neubauer, C.J., Reilly, P.J., and Gundrum, J.

¶ 1. GUNDRUM, J. Brian Harris appeals from a judgment of conviction for burglary, possession of bur-

glarious tools, criminal damage to property, and criminal trespass, all as a repeater. He contends his Fifth Amendment right against self-incrimination was violated when the circuit court denied his motion to suppress evidence and permitted the State to use at trial incriminating, un-Mirandized comments he made to law enforcement officers while in their custody. Harris made his initial comments while seated in the back of a squad car shortly after officers found him in the dark basement of a vacant townhouse, handcuffed him, and asked him preliminary questions of who he was and why he was there. Harris made another challenged remark in response to a detective inquiring at the Kenosha county jail if Harris would be willing to cooperate with the detective by providing a statement. We conclude the court properly denied Harris's suppression motion and permitted the State to use his comments at trial because Harris's initial comments were sufficiently attenuated from the officer's questioning so as to purge any potential taint from the questioning, and with regard to Harris's remark at the jail, the detective's communication to Harris, which prompted the remark, did not constitute "interrogation," and thus the detective did not err in failing to provide Harris the *Miranda*[1] warnings. We affirm.

*Background*

¶ 2. Officer Justin Niebuhr and Detective Chad Buchanan, both of the city of Kenosha police department, were the only witnesses to testify at the suppression hearing. Their relevant, undisputed testimony is as follows.

¶ 3. Niebuhr responded to a report of a possible burglary in progress at a townhouse. At the residence

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

of the reporting neighbor, Niebuhr heard the "constant clinking together of metal" coming from inside the townhouse. The neighbor informed Niebuhr the townhouse was supposed to be vacant.

¶ 4. Niebuhr observed the townhouse was dark inside and appeared vacant. The front and back doors were locked, but a window was "cracked and . . . the latch was undone," so that the window could be opened from the outside. Niebuhr requested backup and eventually gained entry into the townhouse. The clinking noises stopped as the officers moved through the townhouse. Niebuhr and another officer went to the basement, which was from where Niebuhr believed the noises had originated. Using a flashlight while descending the stairs, Niebuhr observed shoes sticking out from underneath another staircase. The officers demanded that anyone in the basement show themselves. Receiving no response, the officers approached the pair of shoes, which belonged to Harris. Harris slowly came out as the officers confronted him.

¶ 5. The officers handcuffed Harris, Niebuhr believes "almost immediately." Niebuhr engaged in "basic questioning" of Harris "trying to find out who he was and, you know, if he lived there, why he was in the building." Though Niebuhr did not recall the exact questions he asked Harris, he described his communications as being a "who you are, what are you doing down here kind of conversation." Also after handcuffing Harris, Niebuhr looked around the basement "for a few minutes," observing "copper piping laying on the ground that was previously up on the ceiling," "a gray duffle bag on the floor . . . contain[ing] a saw and some replacement blades, a bolt cutter-type instrument, some crowbars," and "a flashlight on the floor that had a red lens over the light bulb spot." Harris was even-

tually led up the stairs and out of the townhouse, and placed into the back of Niebuhr's squad car.

¶ 6. Having received Harris's name either directly from Harris or from an "ID" found on him, Niebuhr procured a "mugshot" of Harris. Niebuhr then attempted to get in contact with the owner of the townhouse and was in the process of completing paperwork when Harris, from the back of the squad car, began telling Niebuhr

> that he's been homeless for approximately seven years; that he frequently goes into vacant houses to sleep; that he was going to take the copper piping and sell it for money for food, and that he often commits misdemeanor crimes to get items to sell for food . . . to get by.

Neither Niebuhr nor any other officers were asking Harris any questions when Harris made these comments, and Niebuhr confirmed he never made any threats or promises to Harris in order to induce him to make the comments.

¶ 7. Buchanan testified that he spoke with Harris on the main floor of the Kenosha county jail "just outside where the interview rooms are located." Harris had been brought there, unhandcuffed, by a guard in the jail. On direct examination, the prosecutor asked Buchanan how communication with Harris began. The following exchange took place:

> [Buchanan]: I went there with the intention of asking Mr. Harris if he would like to come with me to the detective bureau to be interviewed. I asked him if he would, and he stated to me something to the effect that they caught me, what's the point.

| [Prosecutor]: | Now, in your report you indicated, I got caught, man, that is there's nothing else to say, something of that nature? |
|---|---|
| [Buchanan]: | I think if that is what it says in my report, that's what he said. |

Neither Niebuhr nor Buchanan had provided Harris with the *Miranda* warnings prior to Harris making his various comments.

¶ 8. The circuit court denied Harris's suppression motion and permitted the State to use Harris's comments at trial. A jury found Harris guilty on all four counts, and he appeals. Additional facts will be set forth as necessary.

## *Discussion*

¶ 9. In reviewing the propriety of a circuit court's denial of a motion to suppress evidence, we uphold the court's factual findings unless they are clearly erroneous, but we independently review whether the facts satisfy the constitutional standard at issue. *See State v. Hambly*, 2008 WI 10, ¶ 49, 307 Wis. 2d 98, 745 N.W.2d 48. The State bears the burden of "establish-[ing] by a preponderance of the evidence whether a custodial interrogation took place." *State v. Armstrong*, 223 Wis. 2d 331, 345, 588 N.W.2d 606 (1999). It is also the State's burden to prove the admissibility of evidence after the primary taint of a constitutional violation has been established. *See State v. Walker*, 154 Wis. 2d 158, 186, 453 N.W.2d 127 (1990), *abrogated, in part, on other grounds by State v. Felix*, 2012 WI 36, 339 Wis. 2d 670, 811 N.W.2d 775.

¶ 10. Harris contends his comments to Niebuhr and Buchanan should have been suppressed and

therefore not introduced at his trial because the comments resulted from custodial interrogation by Niebuhr and Buchanan, and Harris had not been provided the *Miranda* warnings. The State concedes Harris was in custody and had not been provided the *Miranda* warnings when he made all of his comments, but argues the circuit court nonetheless properly denied Harris's motion to suppress and admitted the comments at trial because Harris was not being interrogated at the time he made them. We conclude the court's denial of Harris's motion and admission of his comments at trial was proper.

*Harris's comments to Officer Niebuhr*

■

¶ 11. Harris insists his comments made to Niebuhr in the squad car were "the product of unwarned custodial interrogation," and were not sufficiently attenuated from Niebuhr's questioning in the townhouse basement "so as to purge the statements of the taint of the police misconduct." The State concedes Niebuhr engaged in unlawful custodial interrogation in the basement, but asserts that "the illegal activity . . . had ended and any semblance of an interrogation had been concluded by the time Harris was placed in the police squad."

¶ 12. Based upon the State's concession, we accept, without deciding, that Niebuhr's basement questioning of the handcuffed Harris constituted custodial interrogation, making Niebuhr's questioning illegal due to Niebuhr's failure to provide Harris the *Miranda* warnings. We nonetheless conclude the circuit court did not err in denying Harris's motion to suppress his inculpatory squad car comments because Harris's

making of the comments was sufficiently attenuated from Niebuhr's questioning.

¶ 13. "The primary concern in attenuation cases is whether the evidence objected to was obtained by exploitation of a prior police illegality or instead by means sufficiently attenuated so as to be purged of the taint." *State v. Anderson*, 165 Wis. 2d 441, 447–48, 477 N.W.2d 277 (1991). In answering the attenuation question, we are to consider "the temporal proximity of the official misconduct and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct." *Id.* at 448. If the evidence was "obtained by means sufficiently distinguishable from the prior" unlawful police conduct, the evidence may be properly admitted. *Id.*

¶ 14. We first consider the temporal proximity between Niebuhr's questioning of Harris in the townhouse basement and Harris's inculpatory comments in the squad car. The testimony is unclear as to the precise length of time between these two events, including whether the questioning occurred before or after Niebuhr looked around the basement "for a few minutes," and the circuit court made no findings as to temporal proximity. Nonetheless, it appears the length of time likely was no more than a matter of minutes. *See State v. Artic*, 2010 WI 83, ¶ 76, 327 Wis. 2d 392, 786 N.W.2d 430 (deducing the length of time from various factors in the record, the court said "although the time span is unclear, it appears from the record that it was not more than about five minutes").

¶ 15. There is no hard and fast rule for whether a particular length of time is too long or too short. *See United States v. Conrad*, 673 F.3d 728, 733 (7th Cir.

2012). We agree with the State's observation here that the length of time between Niebuhr's questioning and Harris's inculpatory comments was well beyond any "pregnant pause" one could expect in an ongoing conversation or interrogation. That said, the length of time was not so great that we could conclude that Niebuhr's questions were not still on Harris's mind when he made his inculpatory comments minutes later. Indeed, some of Harris's comments in fact did provide some answers to Niebuhr's earlier questioning. Here, the temporal proximity consideration tips in Harris's favor. *See Artic*, 327 Wis. 2d 392, ¶ 76 (concluding that the five minute time span between the illegal entry and subsequent consent search was "short temporal proximity" which "weigh[ed] against" a finding of attenuation).

■

¶ 16. "To constitute sufficient intervening circumstances"—the second consideration—"the interim facts or evidence must show a 'discontinuity' " between the illegal act and Harris's inculpatory comments "such that the original illegality is weakened and attenuated." *See id.*, ¶ 85. Here, after Niebuhr questioned Harris in the basement, Harris was walked up the stairs and out of the townhouse, and placed into the squad car—a location different from where the questioning had occurred. *See id.*, ¶ 89 (concluding that the upstairs unit of the two family residence—the site of the challenged consensual search—was sufficiently separate from the downstairs unit, into which the officers unlawfully entered, to support attenuation). Niebuhr secured a "mugshot" of Harris, and became occupied with efforts to contact the owner of the townhouse and complete paperwork. Only then—completely removed from verbal engagement by any

officer—did Harris decide to make the inculpatory comments he made. The events between Niebuhr's questioning in the basement and Harris's comments in the squad car did not act in any way to foster a sense of continuation of the questioning, and they provided a meaningful break—a discontinuity—between the questioning and Harris's inculpatory comments. At the time Harris made his inculpatory comments, Niebuhr was thoroughly focused on other matters related to the investigation, not interacting with Harris or looking at him as if awaiting a response, and this would have been completely obvious to Harris. The intervening circumstances weigh in favor of the State, suggesting Harris's comments in the back of the squad car were sufficiently attenuated from Niebuhr's questioning.

¶ 17. The third consideration—"the purpose and flagrancy of the official misconduct"—"is 'particularly' important because it goes to the heart of the exclusionary rule's objective of deterring unlawful police conduct." *Anderson,* 165 Wis. 2d at 448; *see also Artic,* 327 Wis. 2d 392, ¶ 91 (citations omitted); *Conrad,* 673 F.3d at 735 (referring, for this same reason, to this third consideration as "the most important"). Courts consider whether an officer's unlawful actions amounted to "bad faith exploitation of the situation." *Artic,* 327 Wis. 2d 392, ¶ 105 (citation omitted). Nothing in the facts of record suggests that occurred here.

¶ 18. In this case, the basement was dark, the metal clinking sounds stopped as officers moved about the townhouse, and the person making the sounds could well have possessed a potentially dangerous object that made the sounds. Harris was hiding and not responding to the officers' request for anyone in the basement to respond; he then slowly emerged as the officers confronted him. The officers acted in a reason-

788

able manner by "almost immediately" securing Harris in handcuffs. Despite the obvious suspicion surrounding Harris's presence in the home, Niebuhr failed to provide *Miranda* warnings. Nonetheless, his questions to Harris were routine—essentially to the effect of inquiring "who he was and, . . . if he lived there, why he was in the building"—and appear to have been more focused on assessing whether Harris could possibly have any legal right to be where he was and to be doing what he was doing than on procuring an inculpatory statement as part of a criminal investigation. Significantly, when Harris remained silent following Niebuhr's initial inquiry, except at some point possibly providing his name, Niebuhr asked no more questions. Further, the record is undisputed that at no time did Niebuhr make any threats or promises to Harris in order to induce him to make the inculpatory comments he made in the squad car. Indeed, as noted, it is undisputed that Niebuhr was not even paying attention to Harris when Harris began making his inculpatory comments. Neither Niebuhr's initial questioning of Harris nor any actions Niebuhr took thereafter could fairly be considered "bad faith exploitation of the situation." *See Artic*, 327 Wis. 2d 392, ¶ 105. This " 'particularly' important" consideration cuts strongly in favor of attenuation.

¶ 19. We conclude Harris's comments in the squad car were sufficiently attenuated from Niebuhr's unlawful basement questioning so as to be purged of the taint of that illegality. *See Anderson*, 165 Wis. 2d at 447–48. The circuit court did not err in denying Harris's request to suppress these comments and permitting the State to use them at trial.

*Harris's remark to Detective Buchanan*

¶ 20. "*Miranda* warnings need only be administered to individuals who are subjected to a custodial interrogation." *Armstrong*, 223 Wis. 2d at 344–45. The State concedes Harris was in custody when he made his remark to Buchanan at the jail, but argues the remark was not the product of interrogation by Buchanan. We agree.

██ ██

¶ 21. "Interrogation" refers to "words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (emphasis omitted). At the jail, a guard brought an unhandcuffed Harris to Buchanan at a location on the main floor of the jail just outside where interview rooms are located. Buchanan testified at the suppression hearing:

> I went there with the intention of asking Mr. Harris if he would like to come with me to the detective bureau to be interviewed. I asked him if he would, and he stated to me something to the effect that . . . I got caught, man, that is there's nothing else to say . . . .

In its oral ruling at the end of the hearing, the circuit court stated:

> Detective Buchanan's intent was to ask the defendant to come into the interview rooms for an interview and ask the statement or the question was, would you like to give a statement? And the defendant said, I got caught, man, I have nothing else to say. Again, if that simple statement was—would be viewed as either the pressure or the unlawful question to the defendant,

there would be no way to initiate the whole concept of giving a statement. I'm satisfied that . . . the statement was voluntarily [sic]. If there was going to be a statement, it would have been in the interview room and the defendant's response would have—the response to the question by the detective might very well have been, yes, I'll give a statement or, no, I won't give a statement. But the defendant again voluntarily said, I got caught, man, I have nothing else to say.

¶ 22. We note that Buchanan's testimony is unclear as to the precise words Buchanan spoke to Harris. The testimony indicates Buchanan uttered words effectively asking Harris if Harris would like to come with him to the detective bureau to be interviewed. The circuit court indicated in its ruling that Buchanan asked Harris "would you like to give a statement"—words Buchanan never used in his testimony, but which, in one sense, reasonably could be considered a shorthand phrasing of Buchanan's testimony. Thus, whether as a summary of Buchanan's actual testimony or as an erroneous recollection of it,[2] the court chose to use specific words Buchanan never actually spoke in his testimony. Nonetheless, the court's word choice does not affect our conclusion that the message Buchanan in fact conveyed to Harris was

---

[2] The circuit court did not draw this mischaracterization of Buchanan's testimony from whole cloth. In arguments following testimony at the suppression hearing, the prosecutor five times and defense counsel four times restated Buchanan's communication to Harris at the jail as: "[W]ould you like to give a statement?" It is not clear from the record why the prosecutor began this chain of mischaracterizing Buchanan's testimony; but it is not surprising that by the time the court made its oral ruling, the court may have been "remembering" Buchanan's testimony in the manner the prosecutor and defense counsel repeatedly mischaracterized it.

not reasonably likely to lead to an incriminating response and did not constitute interrogation.

¶ 23. In denying the suppression motion, the circuit court ultimately, if implicitly, found that the message Buchanan conveyed to Harris was a procedural one that an objective listener would have interpreted as an invitation for a simple "yes"/"no"-type response indicating Harris's willingness or lack thereof to cooperate with Buchanan by providing a formal statement—not an invitation for Harris to blurt out a substantively incriminating response right then and there.[3] In so finding, the court had the opportunity to directly observe Buchanan's demeanor, tone of voice, inflection, etc., and the finding is supported by Buchanan's testimony. Accordingly, even if Buchanan had uttered the words "would you like to give a statement," *in this particular context,* the ultimate message Buchanan conveyed to Harris would not have amounted to an "interrogation."

¶ 24. As the court observed, without some latitude to inquire as to whether a defendant would be willing to cooperate in providing a formal statement— "there would be no way to initiate the whole concept of giving a statement." While one could argue, from a practical standpoint, Buchanan should have just "played it safe" and provided Harris the *Miranda* warnings prior to saying a single word to him, Buchanan's

---

[3] From Buchanan's undisputed testimony, the circuit court found that Harris in fact responded to Buchanan's communication to him with "I got caught, man, I have nothing else to say." The fact that Harris actually responded to Buchanan's communication with a "no"-type response like this, instead of a substantive statement related to Harris's presence in the townhouse, supports the court's implicit finding that the message Buchanan conveyed to Harris was a procedural one that merely sought a "yes"/"no"-type response.

actual approach is understandable. If Harris rejected Buchanan's overture to cooperate and provide a formal statement—as Harris essentially did when he responded to the effect of "I got caught, man, that is there's nothing else to say"—there would be no subsequent interrogation requiring the *Miranda* warnings. Of his own volition, Harris chose to communicate "*no*" to Buchanan in a foolish manner—leading "there's nothing else to say" with "I got caught"—that provided the State with additional evidence to use against him at trial.

¶ 25. We conclude the circuit court did not err in denying Harris's motion to suppress his remark to Buchanan and permitting the State to use it at trial because Buchanan's communication to Harris was not reasonably likely to elicit an incriminating response; thus, the communication did not constitute interrogation and *Miranda* warnings were not required.

*By the Court.*—Judgment affirmed.