SHIRLEY S. ABRAHAMSON, J.
¶ 55. (dissenting). A homeless man, Brian Harris, was arrested late one night while he was sleeping off a day's drinking in the basement of an abandoned building.[1] He was not given Miranda warnings.[2]
¶ 56. It is easy to use soaring rhetoric promising a court's "unstinting" protection of a criminal defendant's constitutional right not to be compelled to be a witness against himself,[3] "one of the nation's 'most *303 cherished principles.[1] "[4] It's harder to make the promise ring true, however, when a court stints in protecting the defendant's constitutional rights.
¶ 57. I begin by briefly setting the stage underlying Harris's assertion that he was compelled to be a witness against himself.
f 58. Both in the abandoned building's basement where Harris was arrested and in his ride in the back of the squad car on his way to jail, Harris was loquacious. The talkative Harris told the arresting officers that he had been homeless for approximately seven years; that he frequently went into vacant buildings to sleep; that he was going to take copper piping from the building in which he was arrested and sell it for money for food; that he often commits misdemeanor crimes to get items to sell for food to get by; and that he was alone. Harris's statements at his arrest that were admitted at trial are not at issue in this court.[5]
¶ 59. In the morning, Harris was led by jail guards to an area in the jail outside of an interview *304 room. He met up with Detective Buchanan. No one disputes that Harris was in custody. No one disputes that the Detective asked Harris one question and that Harris made an incriminating response before any Miranda warnings were given.[6]
¶ 60. The incriminating response to the Detective was not suppressed by the circuit court.[7] It was introduced at trial during the State's case-in-chief. Harris testified at trial, and the jury found him guilty of all charges.[8] Majority op., ¶ 7.
¶ 61. The admissibility of Harris's response at the jail is at issue in the instant case. The relatively straightforward legal issue presented is whether the Detective's question was interrogation under the Fifth Amendment. The State must prove by a preponderance of evidence that the Detective's question was not an express question or the functional equivalent of an express question for Fifth Amendment purposes.[9] If *305 the Detective's question was either, Harris's response should have been suppressed.
¶ 62. My dissent takes two approaches, each considering the case "upon its own facts," as the case law instructs.[10]
¶ 63. Under the first approach, I probe whether the majority opinion can or should reach a decision when the record does not reveal the precise words of the question the Detective posed to Harris that prompted Harris to respond with an incriminating statement.
¶ 64. Under the second approach, I take the same tack as the majority opinion. I apply the rule of law set forth in State v. Cunningham, 144 Wis. 2d 272, 423 N.W.2d 862 (1988), to the facts. Majority op., ¶[¶ 21-22. Although I use a Cunningham analysis as does the majority opinion, I reach a different result.
¶ 65. I avoid, however, addressing the majority opinion's belabored account of the applicable law on custodial interrogations. The legal principles set forth in the majority opinion would be easier to understand and apply if the opinion stayed with the Cunningham analysis.
I
¶ 66. The first approach examines the record to reveal that the court does not know the Detective's precise word choice for his question to Harris. Exactly what did Detective Buchanan say to Harris that brought forth Harris's incriminating statement? We do not know. Indeed the case is awash with different narratives about the Detective's question to Harris.
*306 ¶ 67. At the suppression hearing, the Detective testified as follows about his question to Harris and Harris's response:
I went there [to the jail] with the intention of asking Mr. Harris if he would like to come with me to the detective bureau to be interviewed. I asked him if he would, and he stated to me something to the effect that they caught me, what's the point.
¶ 68. At trial, the Detective altered his testimony somewhat from the motion hearing and testified as follows about his question to Harris and Harris's response:
I reviewed the reports and went to jail. ... I asked the defendant if he would like to give me a statement, and he said, they caught me man, I got nothing else to say.
¶ 69. The question was not recorded or videotaped and the Detective's communication with Harris ended right then and there.
¶ 70. The State's brief explains that "the altered testimony" does not "materially alter the terrain" and for "purposes of clarity and consistency" it "will go with Detective Buchanan's testimony at trial as the operative fact."[11]
¶ 71. The majority opinion uses the words the circuit court used: "Would you like to give a statement?" Majority op., ¶ 6.
¶ 72. With regard to this wording and to add to the confusion about the words the Detective used to communicate with Harris, the court of appeals concluded that the words "would you like to give a statement" were "never used at trial." The court of *307 appeals assures the reader, however, that the circuit court's "mischaracterization" of the Detective's words did not affect the decision of the court of appeals. The court of appeals explained its position as follows:
The circuit court indicated in its ruling that Buchanan asked Harris "would you like to give a statement"— words Buchanan never used in his testimony, but which, in one sense reasonably could be considered a shorthand phrasing of Buchanan's testimony. Thus whether as a summary of Buchanan's actual testimony or as an erroneous recollection of it, the [circuit] court chose to use specific words Buchanan never actually spoke in his testimony.[12]
¶ 73. Regardless of the precise words the Detective used, the State argues, as might be expected, that the Detective's question can reasonably be interpreted as an inquiry into whether Harris wished to talk with the police, was answerable with a "yes" or "no," and was not the functional equivalent of an express question. In contrast, as might be expected, Harris views the Detective's question as an express question or the functional equivalent of an express question.
¶ 74. Cunningham directs a court to view the law enforcement officer's communication from the suspect's perspective.[13] It is therefore important for a Miranda analysis to know the officer's exact language *308 and the context in which the communication occurred. A law enforcement officer's choice of words might have material bearing on how a suspect will understand the officer's communication. Wording can be dispositive.
¶ 75. Different words may evoke different responses from a suspect, and the same words or substantially the same words may evoke different responses from different justices and different courts.[14]
¶ 76. Not knowing what the Detective said to Harris renders the court's analysis in the instant case weak.
II
¶ 77. The second approach is the one the majority opinion takes: Apply the rule of law set forth in State v. Cunningham, 144 Wis. 2d 272, 423 N.W.2d 862 (1988), to the record to determine whether the communication at issue is, for Fifth Amendment purposes, an express question or the functional equivalent that must be prefaced by Miranda warnings. I do not reach the same conclusion as the majority opinion.
¶ 78. Cunningham, 144 Wis. 2d at 278-79, sets forth the objective observer test to determine whether a law enforcement officer's conduct or words constitutes interrogation of a suspect. Cunningham directs courts to consider the following:[15]
• The Miranda procedures are designed to protect a suspect in custodial situations where the compul *309 sion to confess may be present. When a custodial suspect is interrogated by law enforcement officers without Miranda warnings, there is a presumption that any ensuing statements of the suspect resulting from the unwarned interrogation were compelled and must be suppressed.[16]
• The focus is primarily upon the perception of the suspect to determine whether the officer's words or conduct was reasonably likely to elicit a response.
• The test is not directed at the subjective intent of the officer.
• The officer's communication is judged from the standpoint of an objective observer who has the same knowledge of the suspect as the police officer.
• The objective observer would have the officer's knowledge of a suspect's unusual susceptibility to a particular form of persuasion.[17]
• The objective observer would determine whether the officer's conduct or words play on the suspect's unusual susceptibility.
• The objective observer could, on the sole basis of hearing the officer's remarks or observing the offi *310 cer's conduct, conclude that the officer's conduct or words would have had the force of a question on the suspect.
• The objective observer could, on the sole basis of hearing the officer's remarks or observing the officer's conduct, conclude that the officer's conduct or words would be likely to elicit an incriminating response.
• Officers cannot be held accountable for the unforeseeable results of their words or actions.
¶ 79. The determination of whether the facts of a case satisfy the legal standard articulated in Cunningham is a question of law that this court determines independently of the circuit court.[18] I therefore apply the objective observer test to the facts as a matter of law.
¶ 80. Before meeting Harris in a jail hallway outside of an interrogation room, the Detective had read the reports on Harris and was familiar with Harris's conduct of the previous night. The Detective was well aware that Harris was a very garrulous repeat offender who had already made numerous admissions to the arresting officer.
¶ 81. Thus, the objective observer was on alert that Harris was "unusually susceptible" to the coercive nature of police custody and questioning. The objective observer would have to determine whether the Detective's conduct or words played on the suspect's unusual susceptibility.
¶ 82. The objective observer could, on the sole basis of hearing the Detective's remarks or observing the Detective's conduct, conclude that the Detective's *311 conduct or words would have had the force of a question on the suspect or would be likely to elicit an incriminating response.[19] The objective observer could have concluded that Harris would have perceived the Detective's communication as having the force of a Fifth Amendment interrogation.[20] See majority op., | 34 & n.12.
¶ 83. Informing my conclusions is the principle that the Fifth Amendment's right against self-incrimination calls on courts to be "unstinting in our protection of criminal defendants' rights." Majority op., ¶ 10.
¶ 84. Accordingly, I conclude in this close case that the Detective's words constituted interrogation that should have been (but was not) preceded by Miranda warnings and should have been suppressed.
¶ 85. Finally, I conclude that, had my view prevailed, Harris would be entitled to a remand for a Harrison/Anson hearing to fully assess harmless error.[21]
¶ 86. For the reasons set forth, I dissent.

 At trial, Harris testified that he was too intoxicated to have any memory of the night's events other than glimpses of waking up in a mysterious basement with a police officer standing over him and arresting him.

 Miranda v. Arizona, 384 U.S. 436 (1966).

 Majority op., ¶¶ 10-14.
The Fifth Amendment to the United States Constitution provides that no "person . .. shall be compelled in any criminal case to be a witness against himself. . .." U.S. Const, amend. *303 V. This provision is made applicable to the states through the Fourteenth Amendment. Malloy v. Hogan, 378 U.S. 1 (1964).

 Majority op., ¶ 12.

 Citing State v. Wedgeworth, 100 Wis. 2d 514, 302 N.W.2d 810 (1981), the circuit court ruled that the basement and squad car statements "were voluntary, and they appear to me to be the product of free and unconstrained will, reflecting deliberate choice, not coerce [sic] of improper police pressure."
Harris appealed the circuit court's decision admitting these statements.
The court of appeals ruled that Harris' statements made in the basement were the result of custodial interrogation and should be suppressed. The court of appeals ruled, however, that Harris's statements in the squad car were not the result of interrogation and were sufficiently attenuated from the improper questioning in the basement. State v. Harris, 2016 WI App 2, ¶¶ 11-19, 366 Wis. 2d 777, 874 N.W.2d 602. Harris did *304 not appeal this ruling and does not challenge before this court the admissibility of the statements in the basement or in the squad car.

 "[T]he words 'incriminating response mean any response —whether 'inculpatory or exculpatory—-that the prosecution may seek to introduce at trial.'" State v. Cunningham, 144 Wis. 2d 272, 279, 423 N.W.2d 862 (1988) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 n.5 (1980)).

 The court of appeals affirmed, holding that Harris was not subject to interrogation at the jail. Harris appealed the decision of the court of appeals.

 Harris was charged (as a repeater) with burglary, possession of burglarious tools, criminal damage to property, and criminal trespass. The jury convicted him of all four counts. The circuit court withheld sentence on all counts and put Harris on probation for many months.

 State v. Armstrong, 223 Wis. 2d 331, 345, 588 N.W.2d 606 (1999); State v. Fischer, 2003 WI App 5, 259 Wis. 2d 799, 656 N.W.2d 503.

 Cunningham, 144 Wis. 2d at 274.

 Brief of Plaintiff-Respondent at 5 n.2.

 Harris, 366 Wis. 2d 777, ¶ 22. The court of appeals further explained that the circuit court's mischaracterization of the Detective's testimony was not drawn from "whole cloth" but was probably based on the prosecutor's and defense counsel's frequent restating of the Detective's communication in argument as "Would you like to give a statement?" Harris, 366 Wis. 2d 777, ¶ 22 n.2.

 Cunningham, 144 Wis. 2d at 279 ("[T]he focus of the Innis test is primarily upon the perceptions of the suspect.") (internal quotation marks and citations omitted).

 See, e.g., the discussions in the majority opinion and in the State's brief in State v. Hebert, 82 P.3d 470 (Kan. 2004), and State v. Eli, 273 P.3d 1196 (Hawai'i 2012).

 Cunningham's objective observer foreseeability test involves a review of many fact-intensive factors: the suspect's perspective, the officer's intent, the length of the discussion, the officer's knowledge of the suspect's susceptibility, the *309 suspect's emotional state, and the purpose behind the Miranda and Innis decisions. Cunningham, 144 Wis. 2d at 278-80.

 Miranda, 384 U.S. at 471-72; Dickerson v. United States, 530 U.S. 428, 435 (2000); Oregon v. Elstad, 470 U.S. 298, 309, 310, (1985) ("Miranda requires that the unwarned admission must be suppressed . . .." This is true even though "[t]he failure of police to administer Miranda warnings does not mean that the statements received have actually been coerced, but only that courts will presume [that] the privilege against compulsory self-incrimination has not been intelligently exercised.").

 Confinement might increase a suspect's anxiety and make him more likely to seek discourse with others and more susceptible to talking. See 2 Wayne R. LaFave et al., Criminal Procedure § 6.7(c), at 877 (4th ed. 2015).

 Cunningham, 144 Wis. 2d at 282.

 See Innis, 446 U.S. at 302 n.8 (recognizing that an officer's knowledge "concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the [officer] should have known that [his] words or actions were reasonably likely to elicit an incriminating response").

 I would not introduce the idea of a "diagnostic" question into Miranda law.

 Harrison v. United States, 392 U.S. 219 (1968); State v. Anson, 2005 WI 96, 282 Wis. 2d 629, 698 N.W.2d 776.