# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP1767-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |          Plaintiff-Respondent, |
| |    v. |
| | Brian I. Harris, |
| |          Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
366 Wis. 2d 777, 874 N.W.2d 602
(Ct. App. 2016 – Published)
PDC No.: 2016 WI App 2

| | |
|---|---|
| OPINION FILED: | April 7, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 18, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Kenosha |
|   JUDGE: | Michael S. Wilk |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | ZIEGLER, J. joined by GABLEMAN, J. concurs (opinion filed). |
|   DISSENTED: | ABRAHAMSON, J. dissents (opinion filed). |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the defendants-appellant-petitioners, there was a brief by *Kathleen M. Quinn* and *Kathleen M Quinn Attorney at Law*, Milwaukee, and oral argument by Kathleen M. Quinn.


For the plaintiff-respondent the cause was argued by *David H. Perlman*, assistant attorney general, with whom on the brief was *Brad D. Schimel*, attorney general.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2014AP1767-CR
(L.C. No. 2011CF797)

STATE OF WISCONSIN : IN SUPREME COURT

State of Wisconsin,

      Plaintiff-Respondent,

  v.

Brian I. Harris,

      Defendant-Appellant-Petitioner.

**FILED**

**APR 7, 2017**

Diane M. Fremgen
Clerk of Supreme Court

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 DANIEL KELLY, J. The question before the court is whether the State compelled Petitioner, Brian Harris, to be a witness against himself in violation of the Fifth Amendment to the United States Constitution and article I, section 8 of the Wisconsin Constitution.[1]

---

[1] This is a review of a published decision of the court of appeals, State v. Harris, 2016 WI App 2, 366 Wis. 2d 777, 874 N.W.2d 602, affirming the circuit court's judgment of conviction, Hon. S. Michael Wilk presiding.

I. BACKGROUND

¶2 In the early morning hours of August 13, 2011, a Kenosha resident awoke to loud, metallic-sounding noises coming from an adjacent residence. When the noises persisted for several minutes, a neighbor called the police.

¶3 Officer Justin Niebuhr of the Kenosha Police Department responded and met with the caller. Both could hear the sound of metal clanging coming from inside the neighboring residence. Officer Niebuhr approached the front door of the supposedly-vacant residence and found it locked, and upon looking through a window saw only darkness. In the process of examining the exterior of the residence, Officer Niebuhr noticed the screen was off the unlatched kitchen window.

¶4 After backup arrived, Officers Niebuhr and Arturo Gonzalez entered the residence and traced the noises to the basement. Two additional officers responded to the scene and "cleared" the main and upstairs floors of the residence. Officers Niebuhr and Gonzalez went down to the basement where they found Mr. Harris secreted in a crawl space under the stairs. Strewn about him were copper piping, a flashlight with a red lens, and a duffle bag containing a saw and replacement blades, a bolt-cutter type instrument, and some crowbars. Mr. Harris' outfit included a pair of black work gloves. The officers took Mr. Harris into custody and eventually placed him in Officer Niebuhr's squad car.

¶5 While still in the squad car in front of the residence, Mr. Harris commenced an unprompted narrative of his

2

criminal activities.  Mr. Harris told Office Niebuhr he had been homeless for approximately seven years, he frequently went into vacant homes to sleep, and he often committed misdemeanor crimes to get items to sell.  He said this was his plan for the copper piping.  Neither Officer Niebuhr, nor any of the other officers present, were questioning Mr. Harris when he made these statements.  Officer Niebuhr confirmed he neither said nor did anything of a threatening nature to prise out Mr. Harris' statements, nor did he promise Mr. Harris anything in exchange for them.  Officer Niebuhr did not give Mr. Harris a <u>Miranda</u>[2] warning before he made these statements.

¶6   Later that morning, Detective Chad Buchanan of the Kenosha Police Department went to the Kenosha County Jail to interview Mr. Harris.  He met Mr. Harris at about 9:00 a.m. in the common area, just outside the interview rooms.  What occurred next is not entirely clear, but Detective Buchanan asked a question to the effect of "Would you like to give me a

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

3

statement?"[3]  Mr. Harris responded:  "They caught me man, I got nothing else to say."  Detective Buchanan did not inform Mr. Harris of his Miranda rights prior to speaking with him.

¶7   The State charged Mr. Harris with burglary, possession of burglarious tools, criminal damage to property, and criminal trespass, each as a repeater.  Mr. Harris brought a suppression motion to prevent the State from using his "they caught me" statement at trial.[4]  The circuit court found that "Detective Buchanan's intent was to ask the defendant to come to the interview rooms for an interview and . . . the question was, would you like to give a statement?"  The circuit court said the expected response to this question would have been "yes, I'll give a statement or, no, I won't give a statement."  Consequently, the circuit court found no violation of Mr. Harris's right to be free from self-incrimination, and so denied the suppression motion.  The State used his statement at trial,

---

[3] At the suppression hearing, Detective Buchanan said he asked Mr. Harris "if he would like to come with me to the detective bureau to be interviewed."  At trial, Detective Buchanan testified that he "asked the defendant if he would like to give me a statement . . . ."  Although not entirely clear, it appears Mr. Harris bases his argument on Detective Buchanan's trial testimony.  This makes sense——between the two characterizations, the trial testimony describes a question closer to the Miranda line than the question described at the suppression hearing.  Consequently, our analysis will focus on the formulation presented at trial.  If that passes constitutional muster, then so will the other.

[4] The suppression motion encompassed other statements as well, but the "they caught me" statement is the only one Mr. Harris presented for our review.

following which the jury found Mr. Harris guilty on all four counts.

¶8 Mr. Harris timely appealed his conviction. In a published decision, the court of appeals affirmed. It noted the confusion over the precise wording of the question that preceded Mr. Harris's "they caught me" statement, but found it unimportant to the outcome. The court of appeals concluded that, whatever the exact wording, it was "not reasonably likely to elicit an incriminating response; [and] thus, the communication did not constitute interrogation and Miranda warnings were not required."[5]

## II. STANDARD OF REVIEW

¶9 We employ a two-step process in reviewing a circuit court's denial of a motion to suppress. State v. Eason, 2001 WI 98, ¶9, 245 Wis. 2d 206, 629 N.W.2d 625. First, we review the circuit court's factual findings and uphold them unless they are clearly erroneous. Id.[6] Second, we apply constitutional principles to those facts de novo, without deference to the courts initially considering the question, but benefitting from their analyses. In re Commitment of Mark, 2006 WI 78, ¶12, 292 Wis. 2d 1, 718 N.W.2d 90 ("We also review, de novo, the application of constitutional principles to established

---

[5] Harris, 366 Wis. 2d 777, ¶25.

[6] Notwithstanding the uncertainty over the exact wording of Detective Buchanan's question, neither party argues that any of the circuit court's factual findings were clearly erroneous. Consequently, we do not address this step of the review process.

5

facts."); <u>State v. Hansford</u>, 219 Wis. 2d 226, 234, 580 N.W.2d 171 (1998) ("Although we review questions of law de novo, we benefit from the analyses of the circuit court and the court of appeals.").

### III. DISCUSSION

¶10 Mr. Harris presents a single question for our consideration: Whether the State compelled him to be a witness against himself by using his answer to Detective Buchanan's question at trial.[7] A simple question like "Would you like to give me a statement?" may seem an unlikely candidate for a constitutional violation, but as our analysis here demonstrates, we are unstinting in our protection of criminal defendants' rights.

¶11 There is history behind the protection against self-incrimination, history that reminds us of why that barrier is so important. It is born of experience, and responds to the dangers inherent in the inquisitorial method of questioning suspects:

> The maxim '<u>Nemo tenetur seipsum accusare</u>,'[8] had its origin in a protest against the inquisitorial and manifestly unjust methods of interrogating accused

---

[7] The Fifth Amendment to the United States Constitution provides that no "person . . . [shall] be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Wisconsin Constitution article I, section 8 contains an analogous provision, which says that "No person . . . may be compelled in any criminal case to be a witness against himself or herself."

[8] "No one is bound to accuse himself."

persons, which [have] long obtained in the continental system, and, until the expulsion of the Stuarts from the British throne in 1688, and the erection of additional barriers for the protection of the people against the exercise of arbitrary power, [were] not uncommon even in England. While the admissions or confessions of the prisoner, when voluntarily and freely made, have always ranked high in the scale of incriminating evidence, if an accused person be asked to explain his apparent connection with a crime under investigation, the ease with which the questions put to him may assume an inquisitorial character, the temptation to press the witness unduly, to browbeat him if he be timid or reluctant, to push him into a corner, and to entrap him into fatal contradictions, which is so painfully evident in many of the earlier state trials, . . . made the system so odious as to give rise to a demand for its total abolition.

Brown v. Walker, 161 U.S. 591, 596—97 (1896).[9]  The ease with which innocent questions can become inquisitorial requires that this protection apply to criminal suspects whether they are inside or outside of the courtroom:  "[T]he privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal courtroom but also from 'informal compulsion exerted by law-enforcement officers during in-custody questioning.'"  Pennsylvania v. Muniz, 496 U.S. 582, 589 (1990) (quoting Miranda v. Arizona, 384 U.S. 436, 461 (1966)).  Thus, our constitutional protection against self-

---

[9] Although this excerpt from Brown specifically addressed coerced confessions, instead of the broader right to remain silent (which we address here), its condemnation of the inquisitorial method served as part of the motivating rationale for the ubiquitous Miranda warnings.  And its description of the inquisitorial method provides valuable insight as we consider what constitutes the "functional equivalent" of an interrogation.

7

incrimination is called to duty whenever the State interrogates a suspect in police custody.  See Miranda, 384 U.S. 436; see also State v. Armstrong, 223 Wis. 2d 331, ¶29, 588 N.W.2d 606 (1999).

¶12  This freedom from compelled self-incrimination is one of the nation's "most cherished principles." Miranda, 384 U.S. at 458.  We are sufficiently solicitous of this protection that we guard it by patrolling a generous buffer zone around the central prohibition.

A. Procedural Requirements

¶13  The most important aspect of that buffer is the right to remain silent while in police custody.  We actualize the right by requiring the State's agents, before conducting an in-custody interrogation, to formally instruct the suspect of his constitutional rights and then conduct themselves according to how he elects to preserve or waive them.  Thus, a suspect must

> be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Miranda, 384 U.S. at 479.

¶14  This procedural safeguard arose out of an understanding that custodial interrogations present a uniquely intimidating atmosphere that can interfere with a suspect's exercise of his rights: "The concern of the Court in Miranda was that the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the

8

individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." Rhode Island v. Innis, 446 U.S. 291, 299 (1980) (quoting Miranda, 384 U.S. at 457-58). Requiring this warning, and scrupulous adherence to the suspect's decisions thereafter, give us assurance that his decision to remain silent has not been overborne. The consequence of failing to honor this safeguard is loss of the evidence: "[U]nless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against [a suspect]." Miranda, 384 U.S. at 479.

¶15 There is no doubt Mr. Harris was in police custody when Detective Buchanan asked whether he would like to make a statement (he was in jail), so our inquiry focuses on whether that question qualifies as an interrogation. As we discuss below, custodial interrogation can take the form of either express questioning or its functional equivalent.[10] We will analyze Detective Buchanan's question and Mr. Harris' response under each rubric. If either analysis reveals the question to be an interrogation, then we must suppress Mr. Harris' response because it was not preceded by a Miranda warning.

---

[10] "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

9

## B. Express Questioning

¶16 "Express questioning" does not encompass every inquiry directed to the suspect. It covers only those questions "designed to elicit incriminatory admissions." Pennsylvania v. Muniz, 496 U.S. 582, 602 n.14 (1990). See also Doe v. U.S., 487 U.S. 201, 211 (1988) ("Unless some attempt is made to secure a communication—written, oral or otherwise—upon which reliance is to be placed as involving [the accused's] consciousness of the facts and the operations of his mind in expressing it, the demand made upon him is not a testimonial one." (quoting J.H. Wigmore, 8 Wigmore on Evidence, § 2265 (4th ed. 1988))).

¶17 It is the nature of the information the question is trying to reach, therefore, that determines whether it is inquisitorial. If that information has no potential to incriminate the suspect, the question requires no Miranda warnings. Id. at 211 n.10 ("In order to be privileged, it is not enough that the compelled communication is sought for its content. The content itself must have testimonial significance.").

¶18 Detective Buchanan's question did not constitute express questioning because it sought nothing that could be potentially incriminating. Although his question was certainly designed to obtain a response, the only information it sought was whether Mr. Harris would like to make a statement; it did not seek the statement itself. The response to such a question is either "yes" or "no," and neither would have any testimonial significance whatsoever. Thus, Detective Buchanan's question

10

did not constitute "express questioning" because the constitutional privilege applies only to the search for incriminating evidence.

## C. Functional Equivalence

¶19 There are more ways than one to obtain incriminating evidence from a suspect. Miranda addressed itself to the most obvious—express questioning. But there are techniques of persuasion that, in a custodial setting, can create the same potential for self-incrimination even in the absence of an express question. So the Innis Court expanded the prophylactic buffer by applying Miranda's procedural safeguards to the "functional equivalent" of an interrogation. Innis, 446 U.S. at 300-01. Such an equivalent includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301.

¶20 The test for determining what words or behavior might constitute the functional equivalent of an interrogation is not as straightforward as it first appears. The test (as stated above) inquires into what the police officer should know, implying the test might be conducted from his perspective. However, Innis requires that we account for the suspect's perception of events for the specific purpose of broadening the buffer: "This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices,

11

without regard to objective proof of the underlying intent of the police." Id.

¶21 This means that, even where an officer's action had a purpose other than interrogation, the action "must be viewed from the suspect's perspective to determine whether such conduct was reasonably likely to elicit a response." State v. Cunningham, 144 Wis. 2d 272, 280, 423 N.W.2d 862 (1988). Further, Innis noted that the police may need to be mindful of the ease with which a given suspect might be persuaded to make an incriminating statement: "Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 302 n.8.

¶22 In Wisconsin, we implement the "functional equivalency" standard by positing a reasonable third-person observer and inquiring into how such a person would expect the suspect to react to the officer's words and actions:

> [I]f an objective observer (with the same knowledge of the suspect as the police officer) could, on the sole basis of hearing the officer's remarks or observing the officer's conduct, conclude that the officer's conduct or words would be likely to elicit an incriminating response, that is, could reasonably have had the force of a question on the suspect, then the conduct or words would constitute interrogation.

12

Cunningham, 144 Wis. 2d at 278-79. This test is objective with respect to each of the participants in the interaction. That is to say, we do not consider what any of the participants actually intended or understood. We consider only what the objective third-party observer would conclude from the available information.

¶23 In determining whether Detective Buchanan's dialogue with Mr. Harris is the functional equivalent of an interrogation, we consider more than just the bare words with which he formed his question. We must reconstruct——as near to verisimilitude as possible——the entire context within which the dialogue took place. Then, as described above, we ask whether a reasonable observer would conclude that the suspect in the vignette would understand the officer's words and actions as reasonably likely to elicit an incriminating response.

¶24 Here is what we know about the circumstances in which Detective Buchanan had his brief conversation with Mr. Harris. In the very early hours of a morning in 2011, the police found Mr. Harris secreted away in the basement of a house in which he did not belong, with copper piping and burglarious tools arrayed about him. After taking him into custody, he was placed in the back seat of Officer Niebuhr's patrol car, whereupon he commenced divulging a great deal of information, much of it incriminating. For example, he said he had been homeless for seven years and frequently sleeps in vacant houses. He also said he often commits misdemeanor crimes to obtain things to sell "to get by," and that is what he intended to do with the

13

copper piping.

¶25 Mr. Harris offered all of this information without prompting. Officer Niebuhr made no threats or promises to obtain the statements, and in fact asked no questions of Mr. Harris at all (while he was in the patrol car) before he provided this information. Officer Niebuhr said Mr. Harris did not appear to be intoxicated, overly tired, or otherwise not in control of his faculties. He also appeared to be clean and decently attired.

¶26 The police then transported Mr. Harris to the Kenosha County Jail. Later in the morning, at about 9:00 a.m., Detective Buchanan (who had not been present for Mr. Harris' arrest), went to the jail to interview him. A guard brought Mr. Harris (who was not handcuffed) to the main floor of the jail. Detective Buchanan met him in a common area just outside the interview rooms. He did not smell alcohol on Mr. Harris or observe any behavior that would indicate he was intoxicated. Detective Buchanan then asked Mr. Harris the question at issue in this case.

¶27 As all such scenarios must be, this vignette is fact-bound, which does not make it especially amenable to fixed rules of interpretation. However, past cases help sketch the boundary between "functional equivalents of interrogation" and constitutionally-innocent questions and acts. We collected a sampling of such cases in State v. Hambly, 2008 WI 10, 307 Wis. 2d 98, 745 N.W.2d 48, some of which we address below.

¶28 Our evaluation of Detective Buchanan's question

14

accounts for the following principles useful in identifying the "functional equivalent" of an interrogation. As we consider and apply those principles, we keep firmly in mind that the ultimate purpose of our analysis is to protect against coerced confessions by respecting a suspect's decision to remain silent: "In deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in *Miranda* and *Edwards [v. Arizona, 451 U.S. 477 (1981)]:* preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." Arizona v. Mauro, 481 U.S. 520, 529-30 (1987). Although the effect of that coercion may differ from suspect to suspect, a specific individual's special susceptibility enters the equation only if the State's agents should know of it. See, e.g., Innis, 446 U.S. at 303 n.10 (the "subtle compulsion" associated with an unknowing appeal to the suspect's conscience is not an interrogation).

¶29 From our cases addressing police statements made to a suspect, as opposed to questions asked of him, we confirm that our primary point of focus is on the reasonably likely effect of the officer's words on the suspect, not their grammatical format. Seemingly innocuous statements, when freighted with subtext or inquisitorial design, can become an interrogation. Thus, a dialogue with a suspect can constitute an interrogation even when law enforcement officers ask no questions. Hambly, 307 Wis. 2d 98, ¶46 ("A law enforcement officer may thus be viewed as interrogating a suspect by a statement, without asking

15

a single question, if the law enforcement officer's conduct or speech could have had the force of a question on the suspect.").

¶30 However, to rise to the level of an interrogation, the officer's statements (or, in this case, question) must exert a compulsive force on the suspect: "Interrogation must reflect a measure of compulsion above and beyond that inherent in custody itself." Id. (quoting Innis, 446 U.S. at 300) (internal marks omitted). For example, an officer's cryptic comment about information only the perpetrator of the crime would recognize may be considered functionally equivalent to an interrogation because of the effect the comment causes. State v. Bond, 2000 WI App 118, 237 Wis. 2d 633, 614 N.W.2d 552. Similarly, giving unresponsive answers to questions posed by a suspect with the intent of provoking an incriminating response, and using interrogation techniques during the conversation, can serve as the functional equivalent of an interrogation. Hambly, 307 Wis. 2d 98, ¶¶63-65 (citing Hill v. United States, 858 A.2d 435 (D.C. Ct. App. 2004) (finding that an officer telling a suspect that "he told us what happened" was unresponsive to the defendant's question regarding another person in custody and, when coupled with other common interrogation techniques designed to elicit a response, met the functional equivalency test)).

¶31 But police interactions with a suspect do not amount to interrogations so long as they are not reasonably likely to elicit an incriminating response. That is why law enforcement officials may make context-appropriate, and accurate, comments to a suspect without running afoul of Miranda and Innis. They

16

can, for example, provide information responsive to questions posed by defendants.  Hambly, 307 Wis. 2d 98, ¶¶65-66 (finding no functional equivalence where defendant made an incriminating statement after the police officer, prior to giving him the Miranda warnings, informed the defendant of why he was under arrest).  Similarly, if a suspect volunteers incriminating information following an officer's non-leading, direct responses to the suspect's questions about possible charges against him, there has been no functional equivalent of an interrogation. State v. Fischer, 2003 WI App 5, 259 Wis. 2d 799, 656 N.W.2d 503 (finding that "an objective observer would not, on the sole basis of hearing [defendant's] words and observing his conduct, conclude that [an officer's] answers to [defendant's] direct questions about the evidence against him would be likely to elicit an incriminating response . . . .").  Nor are non-editorialized statements of fact the functional equivalent of an interrogation.  Easley v. Frey, 433 F.3d 969 (7th Cir. 2006) (finding no interrogation when suspect confessed after being accurately informed that someone had implicated him in a crime, and that he could be subject to the death-penalty if convicted).

¶32 Finally, we must also pay attention to the atmosphere in which the suspect incriminates himself.  As Innis observed, the Miranda Court was concerned with the "interrogation environment" created by custodial questioning.  Innis, 446 U.S. at 299.  A police officer's quotidian question posed to a person strolling in a park may carry an objectively different import if growled at a manacled suspect held incommunicado for an extended

17

period of time in a stark interview room.

¶33 With all of this in mind, we have no difficulty finding that Detective Buchanan's question was not the functional equivalent of an interrogation under the Cunningham formulation. There is no indication Detective Buchanan intended his question to elicit an incriminating statement, nor is there anything to suggest that asking a suspect whether he would like to make a statement is a police practice designed to surreptitiously cause the suspect to divulge incriminating evidence.

¶34 Further, the context in which he asked the question conveyed a non-inquisitorial purpose. Mr. Harris and Detective Buchanan were standing in a common area outside the interview rooms. A reasonable observer would conclude that Detective Buchanan's question was diagnostic in nature: Should he conduct Mr. Harris into the interview room where he would then give his statement, or should he instead return Mr. Harris to his cell?[11] Incidentally, Mr. Harris' response strongly suggests this is how he understood it, too. He said: "They caught me man, I got nothing else to say." The latter part of his statement indicates he believed there was no point in proceeding to the interview room, and so he gave what amounted to a functional "no" to the Detective's invitation. The initial clause of his

---

[11] By "diagnostic" we mean a question that seeks information useful for a State agent's functional (as opposed to inquisitorial) interaction with a suspect.

18

statement simply (and, perhaps, unwisely) explained why he was declining the invitation. But even if he subjectively understood it otherwise, a reasonable observer would not expect this question, presented in this setting, to convey to Mr. Harris that he was being asked to immediately provide incriminating information.[12]

¶35 This diagnostic question aligns well with situations in which we find no constitutional violation when police convey non-editorial statements of fact to suspects, or provide accurate responses to their questions. In neither of those circumstances is there an inquisitorial subtext to the communication. That is true here as well. Detective Buchanan's

---

[12] Mr. Harris urges us to follow the conclusion reached in State v. Hebert, 82 P.3d 470 (Kan. 2004). But Messrs. Harris and Hebert's situations are sufficiently dissimilar that the Kansas Supreme Court's resolution does not counsel a different result here. There, Special Agent Cordts, before giving the Miranda warnings, said:

Talk to you a little bit and get both sides of the story. I've only heard one side of the story and, obviously, there's always two sides of a story here and I'd like in your words, your input and tell me what happened and explain in your words and coming from you. Would you like the opportunity to tell me your side of the story?

Id. at 480. Mr. Hebert then started divulging incriminating information.

Agent Cordts' question is similar to that of Detective Buchanan. But unlike here, it did not exist in isolation. The preamble to Agent Cordts' question conveyed the idea that he wanted Mr. Hebert to start talking. Agent Cordts' statement and question, taken together, was tantamount to an instruction to give a statement. Thus, Hebert is substantively distinct from Detective Buchanan's isolated diagnostic question, and so can give Mr. Harris no support.

question was not an excerpt from an extended conversation, nor was there any indication Detective Buchanan was pressuring Mr. Harris or menacing him.  There was no trickery, no good cop/bad cop routine, no attempt to make him contradict prior statements, and no evidence of any other discernible form of interrogation technique.[13]  Thus, there was no proscribed inquisitorial element to the question.  Sometimes, an inquiry calling for a "yes" or "no" answer really does seek nothing more than that.

¶36 Finally, there is the question of what the police knew, or should have known, about Mr. Harris and any particular susceptibility he may have had to a particular form of persuasion.  Innis, 446 U.S. at 302 n.8.  This question need not detain us long because the record does not indicate that Detective Buchanan exercised any form of persuasion, either expressly or implicitly, when he asked if Mr. Harris wished to make a statement.  We will, however, briefly address Mr. Harris' suggestion that his particular vulnerability to police questioning made Detective Buchanan's question an interrogation.

¶37 Mr. Harris says his "emotional state was one in which he was especially inclined to explain himself to law enforcement with statements that a prosecutor would want to introduce at trial."  He says Detective Buchanan, having read the police

---

[13] We list these techniques only to identify ways in which police conduct may become inquisitorial, thereby serving as the functional equivalent of an interrogation.  We are not suggesting there is anything amiss with these tactics when employed in the proper context.

20

reports before meeting him outside of the interview rooms, would have known this. He does not say what that emotional state was or how Detective Buchanan was supposed to infer from the report's recounting of events what his emotional state had been. Nor does he say what his emotional state at the time of arrest might tell Detective Buchanan about his emotional state when he met him outside the interview rooms. Because so many factors and inputs affect one's state of mind, emotional lability is to be expected. So a person's emotional condition from hours past is a poor predictor of what it might be presently.

¶38 Mr. Harris points out, correctly, that the police reports reveal he provided several unprompted incriminating statements to Officer Niebuhr after he was arrested. He says this should have warned Detective Buchanan that his question would likely result in incriminating statements. Mr. Harris' conclusion, however, does not logically follow from his premise. One may deduce from the report that Mr. Harris may be loquacious, but little more. It says nothing about how he responds to questioning—his statements were, after all, unprompted. And neither Officer Niebuhr nor any other State agent had exercised any form of persuasion on Mr. Harris before he implicated himself. Thus, his interaction with Officer Niebuhr could not instruct Detective Buchanan on how particular forms of persuasion might affect him. Whatever reason Mr. Harris had for volunteering his statements to Officer Niebuhr, his behavior did not indicate he would be particularly prone to incriminating himself in response to Detective Buchanan's

21

question.

¶39 Our analysis of this factor would be incomplete if we did not account for both sides of the "susceptibility" ledger. That is to say, we should consider not just what might make him more susceptible to police tactics, but also what would be likely to make him less susceptible. This was not Mr. Harris' first encounter with police questioning. Nor was it his first time being arrested or convicted. In fact, he was charged in this case as a repeat offender. Repeat, indeed——the record discloses that this conviction makes it an even dozen for Mr. Harris. His familiarity with the criminal justice system does not, of course, diminish the State's obligation to scrupulously follow constitutional mandates. But our project at this point of the analysis is to discern, as accurately as possible, whether Detective Buchanan's question would be reasonably likely to elicit an incriminating response from Mr. Harris. It is reasonable to believe that a person's twelfth time through the criminal justice system will be less intimidating than the first. Inasmuch as Mr. Harris has not identified any characteristic making him particularly susceptible to law enforcement officers' persuasion tactics, we will not infer one for him just because he is loquacious.

¶40 We conclude that there was no functional equivalent of an interrogation because, considered in the context of all the circumstances described above, there was no reasonably causal relationship between the State's words or actions and Mr. Harris' incriminating statement. A question such as "Would you

22

like to give me a statement?", when posed in the situation obtaining here, would not logically cause a suspect to say something incriminating.  It is true that Mr. Harris' "they caught me" statement followed Detective Buchanan's inquiry, but only post hoc ergo propter hoc reasoning can make the question the cause of the answer's incriminating substance.  We will not entertain that logical error.

¶41 Mr. Harris brings to our attention a Hawai'i case with a prescription that would effectively eliminate the need for our "functional equivalency" analysis here.  State v. Eli, 273 P.3d 1196 (Haw. 2012).  In that case, as here, a police officer asked the suspect if he would like to make a statement.  Mr. Eli said he would, without saying anything incriminating.  The officer then gave him the Miranda warnings, only after which Mr. Eli incriminated himself.  Nevertheless, Hawai'i's Supreme Court said the officer's diagnostic question compelled Mr. Eli to serve as a witness against himself.

¶42 The Eli court concluded that a pre-Miranda agreement to give a statement has an effect so coercive that the Miranda warnings cannot counteract it.  So the court said the Miranda warnings must precede any inquiry into whether the suspect would like to speak.  The reasoning appears to be that, once a suspect agrees to give a statement, his will is so completely overthrown that immediately instructing him he need not speak still leaves him unable to remain silent.  Why such an innocuous question would have such a catastrophic effect, and why a suspect would be affected more by the remote question than the immediate

23

instruction, is unclear. We do not, as a rule, assume that a suspect is so fragile that a diagnostic question such as the one posed by Detective Buchanan can shatter his will so thoroughly that it leaves him beyond the rehabilitative ministrations of the Miranda warnings. In point of fact, our jurisprudence is to the contrary.[14]

¶43 Our conclusion mirrors a recent United States Court of Appeals opinion (more recent than Eli) treating an almost identical dialogue. United States v. Wallace, 753 F.3d 671 (7th Cir. 2014). There, agents of the Drug Enforcement Agency raided Mr. Wallace's house, wherein they found large amounts of illegal drugs. During the search, law enforcement officers had marshalled the house's occupants into the front room, including Mr. Wallace. The lead DEA agent approached Mr. Wallace and asked: "[W]ould you mind stepping out to talk about this?" Id.

---

[14] See, e.g., Oregon v. Elstad, 470 U.S. 298, 309 (1985) ("Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made."); State v. Armstrong, 223 Wis. 2d 331, 588 N.W.2d 606 (1999) (finding oral statements made before a Miranda warning inadmissible, but written statements made after Miranda warning admissible); Briggs v. State, 76 Wis. 2d 313, 251 N.W.2d 12 (1977) (finding that even where an initial statement made without Miranda warnings was inadmissible, subsequent statements given at a police station after Miranda warnings were admissible as they were the result of routine investigative procedures); State v. Loeffler, 60 Wis. 2d 556, 211 N.W.2d 1 (1973) (holding that statements given after Miranda warnings are admissible, even when the arrest that preceded the statements was constitutionally deficient).

at 673. Mr. Wallace answered "I don't want to waste your time, everything in there's mine." Id.

¶44 Messrs. Harris and Wallace occupy identical constitutional ground. Both were in police custody. Both were asked by law enforcement officers whether they would like to discuss criminal activity. Both could have fully and accurately answered the question with either a "yes" or a "no." And both chose, instead, to respond with incriminating statements.

¶45 The Wallace court did not belabor the analysis. It observed that "[t]he agent was just asking the defendant whether he *wanted* to make a statement, to which the expected and proper answer would have been yes or no." Id. at 674. So the court found no constitutional violation: "That was not a statement elicited by an interrogation, or even responsive to the agent's question (which called for a yes or no answer, not a confession), and so there was no violation of the *Miranda* rule." Id. And although the court did not explicitly address the Innis functional equivalency test, it relied on that case to support its conclusion.

¶46 The Fifth Amendment to the United States Constitution and article I, section 8 of the Wisconsin Constitution prevent the State's agents from compelling a defendant to serve as a witness against himself. But their protection is against the State. They do not protect Mr. Harris from himself. Whether or not it was wise for him to make the statement he did, he was not coerced into forsaking his silence. Detective Buchanan's question was not the "functional equivalent" of an

25

interrogation, and so no <u>Miranda</u> warnings were necessary before he asked it.[15]

## V. CONCLUSION

¶47 Detective Buchanan's inquiry into whether Mr. Harris would like to make a statement was diagnostic in nature, not inquisitorial, and the circumstances confirm that it was not the functional equivalent of an interrogation. Thus, Mr. Harris' statement that "They caught me man, I got nothing else to say" followed a voluntary decision to speak with Detective Buchanan.

¶48 Because the State did not compel Mr. Harris to be a witness against himself, the judgment of the court of appeals is affirmed.

*By the Court.*—The decision of the court of appeals is affirmed.

---

[15] The dissent is concerned that the uncertainty over the exact wording of Detective Buchanan's question weakens our analysis. Of all the potential ways in which the parties say he may have phrased his question, we opted to consider the one most favorable to Mr. Harris. Indeed, it is the phrasing he adopted in his own briefs. So if there is weakness-inducing uncertainty here, neither logic nor the dissent identifies what it might be.

¶49 ANNETTE KINGSLAND ZIEGLER, J. *(concurring).* I join the majority opinion so long as it is read to answer only the issue presented and does not alter, change, or affect existing case law concerning Miranda, 384 U.S. 436 (1966), or an issue not present here, Goodchild (voluntariness). See State ex rel. Goodchild v. Burke, 27 Wis. 2d 244, 262, 133 N.W.2d 753 (1965). The question in this case is exceedingly narrow. "Miranda warnings need only be administered to individuals who are subjected to a custodial interrogation." State v. Armstrong, 223 Wis. 2d 331, 344-45, 588 N.W.2d 606 (1999), modified, 225 Wis. 2d 121, 591 N.W.2d 604 (1999) (per curiam). There is no dispute that Harris was in custody at the time that Detective Buchanan asked Harris whether he wanted to give a statement. Thus, the only issue this court need resolve in the present case is whether Detective Buchanan's question constitutes "interrogation." Supreme Court case law, in turn, instructs that "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (footnote omitted). I agree with the court's determination that Detective Buchanan's brief interaction with Harris does not fit this definition and that the absence of a Miranda warning prior to that interaction does not, therefore, mandate reversal.

1

¶50 I write separately to clarify that the court's additional writing beyond the narrow question to be answered should not be read to change the law relating to Goodchild inquiries, which are not at issue in this case. A Goodchild analysis is distinct from a Miranda analysis: "In Miranda the question is, was the confession or other statement obtained under such circumstances of custodial interrogation as to require the exclusion of the statement from evidence. In Goodchild the question is, was the statement involuntary and therefore should be excluded from evidence." Roney v. State, 44 Wis. 2d 522, 533, 171 N.W.2d 400 (1969).

¶51 When examining whether a declarant's statement was voluntary, the question is "whether [the statement] was obtained under such circumstances that it represents the uncoerced, free will of the declarant or whether the circumstances deprived him of the ability to make a rational choice." Id. at 532-33.

> This court applies a totality of the circumstances standard to determine whether a statement was made voluntarily. We must balance the personal characteristics of the defendant, such as age, education, intelligence, physical or emotional condition, and prior experience with law enforcement, with the possible pressures that law enforcement could impose. Possible pressures to consider include the length of questioning, general conditions or circumstances in which the statement was taken, whether any excessive physical or psychological pressure was used, and whether any inducements, threats, methods, or strategies were utilized in order to elicit a statement from the defendant.

State v. Davis, 2008 WI 71, ¶37, 310 Wis. 2d 583, 751 N.W.2d 332 (citations omitted).

2

¶52 To be clear, the question in this case is not whether Harris' statement was voluntary; instead, the court has simply been asked to determine whether Detective Buchanan interrogated Harris. At times, the majority opinion could be read to deviate from the relevant analysis and dabble with considerations relevant to voluntariness, conflating the analyses. I join this opinion only if it is read to answer the question of whether this was interrogation, leaving untouched the body of case law which otherwise addresses Miranda or Goodchild. Thus, I write to emphasize that this opinion should not be read to otherwise change the law.

¶53 For the foregoing reasons, I respectfully concur.

¶54 I am authorized to state that Justice MICHAEL J. GABLEMAN joins this opinion.

¶55 SHIRLEY S. ABRAHAMSON, J. *(dissenting).* A homeless man, Brian Harris, was arrested late one night while he was sleeping off a day's drinking in the basement of an abandoned building.[1] He was not given Miranda warnings.[2]

¶56 It is easy to use soaring rhetoric promising a court's "unstinting" protection of a criminal defendant's constitutional right not to be compelled to be a witness against himself,[3] "one of the nation's 'most cherished principles.'"[4] It's harder to make the promise ring true, however, when a court stints in protecting the defendant's constitutional rights.

¶57 I begin by briefly setting the stage underlying Harris's assertion that he was compelled to be a witness against himself.

¶58 Both in the abandoned building's basement where Harris was arrested and in his ride in the back of the squad car on his

---

[1] At trial, Harris testified that he was too intoxicated to have any memory of the night's events other than glimpses of waking up in a mysterious basement with a police officer standing over him and arresting him.

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

[3] Majority op., ¶¶10-14.

The Fifth Amendment to the United States Constitution provides that no "person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. This provision is made applicable to the states through the Fourteenth Amendment. Malloy v. Hogan, 378 U.S. 1 (1964).

[4] Majority op., ¶12.

1

way to jail, Harris was loquacious. The talkative Harris told the arresting officers that he had been homeless for approximately seven years; that he frequently went into vacant buildings to sleep; that he was going to take copper piping from the building in which he was arrested and sell it for money for food; that he often commits misdemeanor crimes to get items to sell for food to get by; and that he was alone. Harris's statements at his arrest that were admitted at trial are not at issue in this court.[5]

¶59 In the morning, Harris was led by jail guards to an area in the jail outside of an interview room. He met up with Detective Buchanan. No one disputes that Harris was in custody. No one disputes that the Detective asked Harris one question and

---

[5] Citing State v. Wedgeworth, 100 Wis. 2d 514, 302 N.W.2d 810 (1981), the circuit court ruled that the basement and squad car statements "were voluntary, and they appear to me to be the product of free and unconstrained will, reflecting deliberate choice, not coerce [sic] of improper police pressure."

Harris appealed the circuit court's decision admitting these statements.

The court of appeals ruled that Harris' statements made in the basement were the result of custodial interrogation and should be suppressed. The court of appeals ruled, however, that Harris's statements in the squad car were not the result of interrogation and were sufficiently attenuated from the improper questioning in the basement. State v. Harris, 2016 WI App 2, ¶¶11-19, 366 Wis. 2d 777, 874 N.W.2d 602. Harris did not appeal this ruling and does not challenge before this court the admissibility of the statements in the basement or in the squad car.

that Harris made an incriminating response before any <u>Miranda</u> warnings were given.[6]

¶60 The incriminating response to the Detective was not suppressed by the circuit court.[7] It was introduced at trial during the State's case-in-chief. Harris testified at trial, and the jury found him guilty of all charges.[8] Majority op., ¶7.

¶61 The admissibility of Harris's response at the jail is at issue in the instant case. The relatively straightforward legal issue presented is whether the Detective's question was interrogation under the Fifth Amendment. The State must prove by a preponderance of evidence that the Detective's question was not an express question or the functional equivalent of an express question for Fifth Amendment purposes.[9] If the Detective's question was either, Harris's response should have been suppressed.

---

[6] "[T]he words 'incriminating response' mean any response——whether 'inculpatory or exculpatory——that the <u>prosecution</u> may seek to introduce at trial.'" <u>State v. Cunningham</u>, 144 Wis. 2d 272, 279, 423 N.W.2d 862 (1988) (quoting <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 n.5 (1980)).

[7] The court of appeals affirmed, holding that Harris was not subject to interrogation at the jail. Harris appealed the decision of the court of appeals.

[8] Harris was charged (as a repeater) with burglary, possession of burglarious tools, criminal damage to property, and criminal trespass. The jury convicted him of all four counts. The circuit court withheld sentence on all counts and put Harris on probation for many months.

[9] <u>State v. Armstrong</u>, 223 Wis. 2d 331, 345, 588 N.W.2d 606 (1999); <u>State v. Fischer</u>, 2003 WI App 5, 259 Wis. 2d 799, 656 N.W.2d 503.

¶62 My dissent takes two approaches, each considering the case "upon its own facts," as the case law instructs.[10]

¶63 Under the first approach, I probe whether the majority opinion can or should reach a decision when the record does not reveal the precise words of the question the Detective posed to Harris that prompted Harris to respond with an incriminating statement.

¶64 Under the second approach, I take the same tack as the majority opinion. I apply the rule of law set forth in State v. Cunningham, 144 Wis. 2d 272, 423 N.W.2d 862 (1988), to the facts. Majority op., ¶¶21-22. Although I use a Cunningham analysis as does the majority opinion, I reach a different result.

¶65 I avoid, however, addressing the majority opinion's belabored account of the applicable law on custodial interrogations. The legal principles set forth in the majority opinion would be easier to understand and apply if the opinion stayed with the Cunningham analysis.

I

¶66 The first approach examines the record to reveal that the court does not know the Detective's precise word choice for his question to Harris. Exactly what did Detective Buchanan say to Harris that brought forth Harris's incriminating statement? We do not know. Indeed the case is awash with different narratives about the Detective's question to Harris.

---

[10] Cunningham, 144 Wis. 2d at 274.

4

¶67 At the suppression hearing, the Detective testified as follows about his question to Harris and Harris's response:

I went there [to the jail] with the intention of asking Mr. Harris if he would like to come with me to the detective bureau to be interviewed. I asked him if he would, and he stated to me something to the effect that they caught me, what's the point.

¶68 At trial, the Detective altered his testimony somewhat from the motion hearing and testified as follows about his question to Harris and Harris's response:

I reviewed the reports and went to jail. . . . I asked the defendant if he would like to give me a statement, and he said, they caught me man, I got nothing else to say.

¶69 The question was not recorded or videotaped and the Detective's communication with Harris ended right then and there.

¶70 The State's brief explains that "the altered testimony" does not "materially alter the terrain" and for "purposes of clarity and consistency" it "will go with Detective Buchanan's testimony at trial as the operative fact."[11]

¶71 The majority opinion uses the words the circuit court used: "Would you like to give a statement?" Majority op., ¶6.

¶72 With regard to this wording and to add to the confusion about the words the Detective used to communicate with Harris, the court of appeals concluded that the words "would you like to give a statement" were "never used at trial." The court of appeals assures the reader, however, that the circuit court's

---

[11] Brief of Plaintiff-Respondent at 5 n.2.

"mischaracterization" of the Detective's words did not affect the decision of the court of appeals. The court of appeals explained its position as follows:

> The circuit court indicated in its ruling that Buchanan asked Harris "would you like to give a statement"——words Buchanan never used in his testimony, but which, in one sense reasonably could be considered a shorthand phrasing of Buchanan's testimony. Thus whether as a summary of Buchanan's actual testimony or as an erroneous recollection of it, the [circuit] court chose to use specific words Buchanan never actually spoke in his testimony.[12]

¶73 Regardless of the precise words the Detective used, the State argues, as might be expected, that the Detective's question can reasonably be interpreted as an inquiry into whether Harris wished to talk with the police, was answerable with a "yes" or "no," and was not the functional equivalent of an express question. In contrast, as might be expected, Harris views the Detective's question as an express question or the functional equivalent of an express question.

¶74 Cunningham directs a court to view the law enforcement officer's communication from the suspect's perspective.[13] It is therefore important for a Miranda analysis to know the officer's

---

[12] Harris, 366 Wis. 2d 777, ¶22. The court of appeals further explained that the circuit court's mischaracterization of the Detective's testimony was not drawn from "whole cloth" but was probably based on the prosecutor's and defense counsel's frequent restating of the Detective's communication in argument as "Would you like to give a statement?" Harris, 366 Wis. 2d 777, ¶22 n.2.

[13] Cunningham, 144 Wis. 2d at 279 ("[T]he focus of the Innis test is primarily upon the perceptions of the suspect.") (internal quotation marks and citations omitted).

6

exact language and the context in which the communication occurred. A law enforcement officer's choice of words might have material bearing on how a suspect will understand the officer's communication. Wording can be dispositive.

¶75 Different words may evoke different responses from a suspect, and the same words or substantially the same words may evoke different responses from different justices and different courts.[14]

¶76 Not knowing what the Detective said to Harris renders the court's analysis in the instant case weak.

II

¶77 The second approach is the one the majority opinion takes: Apply the rule of law set forth in State v. Cunningham, 144 Wis. 2d 272, 423 N.W.2d 862 (1988), to the record to determine whether the communication at issue is, for Fifth Amendment purposes, an express question or the functional equivalent that must be prefaced by Miranda warnings. I do not reach the same conclusion as the majority opinion.

¶78 Cunningham, 144 Wis. 2d at 278-79, sets forth the objective observer test to determine whether a law enforcement

---

[14] See, e.g., the discussions in the majority opinion and in the State's brief in State v. Hebert, 82 P.3d 470 (Kan. 2004), and State v. Eli, 273 P.3d 1196 (Hawai'i 2012).

officer's conduct or words constitutes interrogation of a suspect. Cunningham directs courts to consider the following:[15]

- The Miranda procedures are designed to protect a suspect in custodial situations where the compulsion to confess may be present. When a custodial suspect is interrogated by law enforcement officers without Miranda warnings, there is a presumption that any ensuing statements of the suspect resulting from the unwarned interrogation were compelled and must be suppressed.[16]

- The focus is primarily upon the perception of the suspect to determine whether the officer's words or conduct was reasonably likely to elicit a response.

- The test is not directed at the subjective intent of the officer.

- The officer's communication is judged from the standpoint of an objective observer who has the same knowledge of the suspect as the police officer.

- The objective observer would have the officer's knowledge of a suspect's unusual susceptibility to a particular form of persuasion.[17]

---

[15] Cunningham's objective observer foreseeability test involves a review of many fact-intensive factors: the suspect's perspective, the officer's intent, the length of the discussion, the officer's knowledge of the suspect's susceptibility, the suspect's emotional state, and the purpose behind the Miranda and Innis decisions. Cunningham, 144 Wis. 2d at 278-80.

[16] Miranda, 384 U.S. at 471-72; Dickerson v. United States, 530 U.S. 428, 435 (2000); Oregon v. Elstad, 470 U.S. 298, 309, 310, (1985) ("Miranda requires that the unwarned admission must be suppressed . . . ." This is true even though "[t]he failure of police to administer Miranda warnings does not mean that the statements received have actually been coerced, but only that courts will presume [that] the privilege against compulsory self-incrimination has not been intelligently exercised.").

[17] Confinement might increase a suspect's anxiety and make him more likely to seek discourse with others and more susceptible to talking. See 2 Wayne R. LaFave et al., Criminal Procedure § 6.7(c), at 877 (4th ed. 2015).

8

- The objective observer would determine whether the officer's conduct or words play on the suspect's unusual susceptibility.

- The objective observer could, on the sole basis of hearing the officer's remarks or observing the officer's conduct, conclude that the officer's conduct or words would have had the force of a question on the suspect.

- The objective observer could, on the sole basis of hearing the officer's remarks or observing the officer's conduct, conclude that the officer's conduct or words would be likely to elicit an incriminating response.

- Officers cannot be held accountable for the unforeseeable results of their words or actions.

¶79 The determination of whether the facts of a case satisfy the legal standard articulated in Cunningham is a question of law that this court determines independently of the circuit court.[18] I therefore apply the objective observer test to the facts as a matter of law.

¶80 Before meeting Harris in a jail hallway outside of an interrogation room, the Detective had read the reports on Harris and was familiar with Harris's conduct of the previous night. The Detective was well aware that Harris was a very garrulous repeat offender who had already made numerous admissions to the arresting officer.

¶81 Thus, the objective observer was on alert that Harris was "unusually susceptible" to the coercive nature of police custody and questioning. The objective observer would have to

---

[18] Cunningham, 144 Wis. 2d at 282.

9

determine whether the Detective's conduct or words played on the suspect's unusual susceptibility.

¶82 The objective observer could, on the sole basis of hearing the Detective's remarks or observing the Detective's conduct, conclude that the Detective's conduct or words would have had the force of a question on the suspect or would be likely to elicit an incriminating response.[19] The objective observer could have concluded that Harris would have perceived the Detective's communication as having the force of a Fifth Amendment interrogation.[20] <u>See</u> majority op., ¶34 & n.12.

¶83 Informing my conclusions is the principle that the Fifth Amendment's right against self-incrimination calls on courts to be "unstinting in our protection of criminal defendants' rights." Majority op., ¶10.

¶84 Accordingly, I conclude in this close case that the Detective's words constituted interrogation that should have been (but was not) preceded by <u>Miranda</u> warnings and should have been suppressed.

---

[19] <u>See</u> <u>Innis</u>, 446 U.S. at 302 n.8 (recognizing that an officer's knowledge "concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the [officer] should have known that [his] words or actions were reasonably likely to elicit an incriminating response").

[20] I would not introduce the idea of a "diagnostic" question into <u>Miranda</u> law.

10

¶85 Finally, I conclude that, had my view prevailed, Harris would be entitled to a remand for a Harrison/Anson hearing to fully assess harmless error.[21]

¶86 For the reasons set forth, I dissent.

---

[21] Harrison v. United States, 392 U.S. 219 (1968); State v. Anson, 2005 WI 96, 282 Wis. 2d 629, 698 N.W.2d 776.

11