COURT OF APPEALS
DECISION
DATED AND FILED

April 21, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2021AP1302-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2019CM149

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

   PLAINTIFF-APPELLANT,

V.

RODNEY J. OFTE,

   DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Vernon County: DARCY J. ROOD, Judge. *Affirmed*.

¶1    BLANCHARD, P.J.[1]   Rodney Ofte was charged with violations that included operating a motor vehicle while intoxicated as a second offense and he

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(f) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

moved to suppress evidence. He argued in pertinent part that, shortly before his arrest, sheriff's deputies violated the Fifth Amendment by "interrogating" him while he was "in custody" without first providing him with the warnings for in-custody interrogations required by *Miranda v. Arizona*, 384 U.S. 436, 444, 469 (1966) (establishing a bright-line rule, based on the right against compelled or coerced self-incrimination, that individuals held for interrogation must be clearly informed of fundamental constitutional rights, including the right to remain silent).[2] After taking evidence, the circuit court granted the suppression motion. The State appeals.

¶2      The State does not dispute that no *Miranda* warnings were given at the relevant time, nor does it develop an argument that Ofte was not subject to "interrogation." Instead, the State argues that Ofte was not "in custody" for Fifth Amendment purposes during the interrogation and therefore *Miranda* warnings were not required. I conclude that the State failed to prove, under the totality of the circumstances, either that (1) a reasonable person in Ofte's position would not have felt restraint on his freedom of movement to a degree associated with formal arrest or (2) the environment did not present the same inherently coercive pressures as the station house-type interrogation at issue in *Miranda*. Accordingly, I affirm the suppression ruling.

---

[2] Suspects may not be subjected to custodial interrogations by police unless they have first received warnings that they have the right to remain silent, that any statement they make may be used as evidence against them, and that they have the right to the presence of retained or appointed counsel. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

## BACKGROUND

¶3      The following is background necessary to understand the arguments of the parties as pertinent to the dispositive issue.[3]  All of this evidence was given by a sheriff's deputy, Ryan Paulson.  Paulson was the only witness to testify during the evidentiary portion of the suppression proceedings.[4]

¶4      One cold, windy evening in April 2019, Paulson responded in his official capacity to a report of a passer-by that a truck was "parked on the wrong side of the road" of a highway.  Inside the truck was a man "with his head down

_____

[3] Not pertinent is evidence bearing on an additional argument that Ofte makes, which I do not address.  *See State v. Castillo*, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997) (appellate courts generally strive to decide appeals on narrow grounds).  Ofte's additional argument has two parts.  He first contends that the circuit court found that the sheriff's deputy who dealt most directly with Ofte *intentionally* violated Ofte's rights under *Miranda*, 384 U.S. at 444, 469.  From this, Ofte argues that suppression was required under *State v. Knapp*, 2005 WI 127, ¶2, 285 Wis. 2d 86, 700 N.W.2d 899 (interpreting Article I, Section 8, of the Wisconsin Constitution to require suppression when "physical evidence is obtained as the direct result of an intentional *Miranda* violation").  I do not reach Ofte's *Knapp*-based argument.  Instead, I affirm for the reasons given in the text—without reference to Ofte's argument that the deputy intentionally violated *Miranda*.

Expanding on this topic, the circuit court emphasized a *Knapp*-based rationale for its decision.  But putting aside the allegation of an intentional *Miranda* violation, the court determined that there was a *Miranda* violation:  that the deputies "should have Mirandized" Ofte, because what occurred at the squad car was an "in custody" "interrogation," as those terms are used in Fifth Amendment law, which must be preceded by the *Miranda* warnings.  It is this aspect of the court's decision that I affirm.

[4] The presentation of evidence at the hearing also included the showing of a recording produced by a body camera that Deputy Paulson wore at the time of his interactions with Ofte, but neither party asked the court to admit the recording as evidence and it is not included in the appellate record.  "We are bound by the record as it comes to us."  *Fiumefreddo v. McLean*, 174 Wis. 2d 10, 26, 496 N.W.2d 226 (Ct. App. 1993).  It is the responsibility of the appellant (here, the State) to ensure that the record is sufficient to review the issues that the appellant raises. *Butcher v. Ameritech Corp.*, 2007 WI App 5, ¶35, 298 Wis. 2d 468, 727 N.W.2d 546.  "[W]hen an appellate record is incomplete in connection with an issue raised by the appellant, we must assume that the missing material supports the [circuit] court's ruling."  *Fiumefreddo*, 174 Wis. 2d at 27.  Therefore, I assume that the recording supports the challenged circuit court decision.

and he was not responsive," according to the passer-by, as relayed to Paulson. However, Paulson was never aware of any report of erratic driving by anyone operating the truck.

¶5     A second deputy also responded to this report. Both deputies were in full police uniform, including carrying side arms. When the two deputies arrived on the scene the emergency lights were activated on their squad cars.

¶6     Firefighters and emergency medical services personnel informed the deputies that the man who had been found in the truck was in the back of an ambulance that was on the scene. The deputies made contact with Ofte at the back of the ambulance. Ofte's "speech was slurred," he had "an odor of intoxicants" on his breath, and he had "bloodshot and glassy eyes." Paulson asked Ofte "if he had been drinking that day." Ofte told the deputies that he

> started drinking at a board meeting at around 11:00 a.m. and then changed his story and said that he started drinking at Gasser's Bar & Grill in Viroqua, and then later told me that he started drinking at Nordic Lanes in Westby and then ended up going to Liberty Bar and had a couple drinks there and then went to Viola and had a couple drinks there.

Paulson told Ofte that Paulson "was going to want to run him through field sobriety tests to make sure that he was safe to drive home." Ofte responded that he probably was not safe to drive home.

¶7     Medical personnel on the scene cleared Ofte to leave the ambulance. Paulson "asked [Ofte] to step out." Ofte stepped out of the ambulance, but he "was unsteady on his feet and lost his balance." Paulson

> informed Mr. Ofte that my squad [car] was parked more up towards the hill and that we had to walk up towards my squad car, and he was unsteady on his feet walking towards my squad car. I eventually placed him in the back seat of

4

my squad car and started to question him more about where he was drinking at and how many drinks he had had.

¶8    After Paulson "placed" Ofte "in the back seat" of the marked police vehicle, Paulson resumed the questioning of Ofte that had begun at the ambulance. This was the start of the period in which Ofte contends he was improperly interrogated in custody without having received *Miranda* warnings.

¶9    During this interrogation, Ofte was seated in the squad car, with the rear car door next to his seat open and Paulson standing in the open doorway. Paulson asked Ofte "where he was coming from and the bars that he was at throughout the day." In response, Ofte's version of events "changed again." Paulson challenged Ofte several times regarding Ofte's version of events about where he had been that day, pointing out inconsistencies in what he had already told Paulson.

¶10    When Paulson finished the interrogation at the squad car, Paulson told Ofte that "we were going to a flat surface to perform field sobriety tests." Paulson then shut the open rear door of the car, with Ofte still seated in the back. With the rear door closed, Ofte could not open it from the inside to leave the squad car. Paulson did not tell Ofte that he was not under arrest.

¶11    After shutting the rear squad car door, Paulson got into the driver's seat and drove Ofte, who was still seated in the back, some unspecified distance "to a flat spot" on the side of a highway in order "to run him through field sobriety" tests. During the course of this roadside testing, Ofte complained several times about how cold it was. Paulson agreed with him that it was cold.

¶12    After subjecting Ofte to field sobriety tests, the second deputy asked Ofte to submit to a test on a portable breath testing device (Breathalyzer), and

Paulson administered the test. After getting a reading from the Breathalyzer, Paulson "informed Mr. Ofte that he was going to be placed under arrest for" operating while intoxicated.

¶13 Ofte was charged with violations that included operating while intoxicated as a second offense.

¶14 After Ofte pursued a motion to suppress evidence, the circuit court determined that Paulson had interrogated Ofte at the squad car in violation of his Fifth Amendment rights by failing to provide the *Miranda* warnings.

¶15 I interpret the circuit court as making the following factual findings, beginning with whether Ofte was given the *Miranda* warnings. Neither side asked Paulson at the hearing whether he provided the *Miranda* warnings to Ofte at any time. But Paulson did not testify to giving the warnings and it was an implied finding of the circuit court that Paulson did not provide the *Miranda* warnings to Ofte at any time before he was formally placed under arrest following the roadside testing. The State does not dispute as much on appeal.

¶16 The circuit court implicitly credited all of Paulson's testimony.[5] For example, the court credited his testimony that Paulson observed Ofte to "smell of

---

[5] There is one possible exception, but it could not be relevant to the Fifth Amendment analysis that I apply in the text because it involves the *Knapp*-related discussion that I do not address. Explaining the possible exception, Paulson suggested in his testimony that he did not formally place Ofte under arrest before the interrogation at the squad car because Paulson is required, in all suspected intoxicated operator cases, to attempt to conduct field sobriety tests before placing the suspect under arrest. Paulson implied that this was part of his training. In making its ruling the circuit court said that Paulson engaged in a "charade" in not placing Ofte under arrest before the interrogation at the squad car. Whatever the court precisely meant by this, it necessarily involved the *Knapp* issue. When the *Knapp* issue is put to the side, the court did not suggest that any aspect of Paulson's testimony was inaccurate.

intoxicants," display "glassy eyes," and "struggl[e] with his walking." In addition, neither side suggested in argument to the circuit court, nor argues now on appeal, that Paulson testified inaccurately on any topic.

¶17 The circuit court made no clear finding regarding the length of time that Paulson interrogated Ofte after placing him in the squad car. Again, because the recording from Paulson's body camera that the circuit court observed is not in the record, I must assume all ambiguity in favor of the circuit court decision. *See supra* note 4. The circuit court ambiguously responded "[r]ight" after Ofte's counsel estimated that the interrogation at the squad car lasted "certainly a few minutes" (suggesting that "a few" was a minimum number and that the time period could have been longer) and the prosecutor estimated "a couple" of minutes. The court proceeded to observe that 30 minutes of interrogation has been treated in case law as a long period of time for Fifth Amendment purposes, and conveyed the idea that the length of the interrogation here was shorter than that. Based on this record, I will assume that the interrogation lasted some number of minutes between two and 30, probably closer to two than to 30.

¶18 The circuit court found that Ofte was in "a locked squad" during the interrogation, with Paulson "impeding [Ofte's] departure."[6] By using the term

---

[6] Regarding the "locked" status of the squad car during the interrogation, the following was the strong implication of Paulson's testimony, and in any case the following was implicitly found by the circuit court and not contested by the State: The rear door of the squad car that was opposite to the one that was opened (at which Paulson stood) was closed and Ofte could not have opened the opposite rear door. On a related note, the State makes the factual argument that the "door of the police vehicle was not closed" during the interrogation, and therefore Ofte "was not locked into the back of the patrol car." This reference is unclear to me, but in any case the circuit court had a basis to determine that (1) Paulson's actions caused Ofte to be confined in the back of the squad car throughout the interrogation and (2) Paulson (accurately, as it turned out) predicted to Ofte before the interrogation that he would be transporting Ofte, still in the back of the squad car, to another location.

"impeding," the court apparently meant that Paulson prevented Ofte from being able to get out of the squad car throughout the course of the interrogation at the squad car, not that Paulson at any time stopped Ofte from trying to get out. There was no evidence that Ofte actually attempted to get out between the time Paulson placed him there and when Paulson closed the door and began the drive to the new location for the field sobriety tests.

¶19     As remedies, the circuit court ordered that "all evidence gathered after [Ofte] was placed in [Deputy] Pauls[o]n's car, including statements made by the defendant, evidence obtained from the field sobriety tests, and the results from the blood test, are suppressed."

¶20     The State appeals the suppression decision.

## DISCUSSION

¶21     The review of an order granting or denying a suppression motion presents an issue of constitutional fact. *State v. Johnson*, 2013 WI App 140, ¶6, 352 Wis. 2d 98, 841 N.W.2d 302. Appellate courts uphold circuit court findings of fact unless they are clearly erroneous and independently review the application of constitutional principles to those facts. *Id.*

¶22     Before summarizing the law pertinent to this appeal, I pause to note that the State raises a single, narrow argument. The State does not challenge the remedies ordered by the circuit court.[7] It also does not challenge as clearly

---

[7] I emphasize that the State has abandoned on appeal any remedies-related argument, as distinct from a challenge to the suppression decision itself. Neither the State's opening brief nor its reply brief reference the remedies topic. Through abandonment, the State in effect concedes that the remedies ordered by the circuit court are appropriate if the suppression decision is affirmed and I am not free to develop any argument on this topic. *See Munger v. Seehafer*, 2016

(continued)

8

erroneous any fact that was found or implicitly found by the circuit court. In addition, the State does not develop an argument that Paulson's questioning of Ofte at the squad car did not constitute "interrogation" for Fifth Amendment purposes.[8]

¶23 With those clarifications, the State's argument is exclusively the following: based on the facts here, the circuit court misapplied the legal analysis set forth in *State v. Gruen*, 218 Wis. 2d 581, 597-98, 582 N.W.2d 728 (Ct. App. 1998) (defendant was not in custody for Fifth Amendment purposes when, after a traffic accident, police stopped him near the scene, frisked him, and placed him in a police van for 10-15 minutes without handcuffs and then asked "three short, general, common-sense investigatory questions"). As applied to the specific facts here, the issue is whether the State can show that Ofte was not "in custody" for Fifth Amendment purposes during the interrogation that occurred at the squad car.

¶24 Our supreme court has recently summarized the pertinent framework as follows:

---

WI App 89, ¶42, 372 Wis. 2d 749, 890 N.W.2d 22 (this court does not abandon its neutrality to develop an argument for a party).

[8] The State asserts that, when Ofte was in the back of the squad car, Paulson asked Ofte "preliminary questions such as where he had been that day, if he had been drinking, etc., which is standard practice for law enforcement officers investigating a potential operating while intoxicated offense." If this is intended as an attempt to argue that the questioning at the squad car was not "interrogation" for Fifth Amendment purposes, it is undeveloped for at least three reasons. First, it fails to come to grips with Paulson's testimony that he actively challenged Ofte during the questioning at the squad car. Second, it does not attempt to apply the legal standards governing the definition of "interrogation" in this context. Third, all of the other references in the State's opening brief, including the heading of its argument section and the conclusion of the argument section, identify the only issue raised on appeal to be whether Ofte was "in custody" for Fifth Amendment purposes when he was questioned at the squad car. Thus, the State has abandoned the "interrogation" topic as an issue on appeal.

The Fifth Amendment of the United States Constitution provides in relevant part: "No person ... shall be compelled in any criminal case to be a witness against himself ...." In *Miranda*, the Supreme Court created a set of procedural safeguards, enforced by the remedy of exclusion, aimed at "protecting a defendant's Fifth Amendment privilege against self-incrimination." ….

… *Miranda* is a judicially instituted effort to protect against self-incrimination by creating an unrebuttable legal presumption of coercion whenever the warnings are not administered….

….

The United States Supreme Court has made clear that "custody" for purposes of *Miranda* is not equivalent to a dictionary definition of the term. Rather, "custody" in the context of *Miranda* "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."

The *Miranda* custody analysis proceeds in two steps. First, courts "ascertain whether, in light of 'the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" This requires examining the totality of the circumstances, including relevant factors such as "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." The inability to leave and terminate the conversation, however, is not enough on its own to trigger the need for *Miranda* warnings. This inquiry "is simply the first step in the analysis, not the last." "[T]he freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." Instead, courts proceed to the second step in the custody analysis where they ask "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."

*State v. Halverson*, 2021 WI 7, ¶¶13-14, 16-17, 395 Wis. 2d 385, 953 N.W.2d 847 (alterations in original, footnote and citations omitted); *see also State v. Dobbs*, 2020 WI 64, 392 Wis. 2d 505, 945 N.W.2d 609 ("A person is in custody for

*Miranda* purposes if 'there is a formal arrest or restraint on freedom of movement of a degree associated with a formal arrest,'" and "'the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" (quoting *State v. Bartelt*, 2018 WI 16, ¶31, 379 Wis. 2d 588, 906 N.W.2d 684, and *California v. Beheler*, 463 U.S. 1121, 1125 (1983))).

¶25    The issue is not whether Ofte was lawfully detained under the Fourth Amendment, but instead whether he was "in custody" for Fifth Amendment purposes and therefore entitled to *Miranda* warnings before interrogation. *See Gruen*, 218 Wis. 2d at 593. This is true even though many of the same factors that would determine whether the detention at the time of interrogation was reasonable under the Fourth Amendment would also be relevant to the *Miranda* custody Amendment analysis. *See id.* at 595-96; *see also Dobbs*, 392 Wis. 2d 505, ¶¶56-60 (distinguishing between Fourth and Fifth Amendment protections in this context; noting that a detention during a traffic stop might satisfy standards under the Fourth Amendment but not the Fifth Amendment, "if under the totality of the circumstances a detained motorist's freedom of action is curtailed to a degree associated with a formal arrest").

¶26    As our supreme court has also explained, in addressing whether a suspect was "in custody" for purposes of Fifth Amendment analysis,

> [t]here are several factors we consider, including: "the defendant's freedom to leave; the purpose, place, and length of the interrogation; and the degree of restraint." When evaluating the "degree of restraint," we consider "whether the suspect is handcuffed, whether a weapon is drawn, whether a frisk is performed, the manner in which the suspect is restrained, whether the suspect is moved to another location, whether questioning took place in a police vehicle, and the number of officers involved."

11

*Dobbs*, 392 Wis. 2d 505, ¶54 (citations omitted).

¶27 The State bears the burden of proving that a custodial interrogation restricted by the Fifth Amendment did not take place. *State v. Harris*, 2016 WI App 2, ¶9, 366 Wis. 2d 777, 874 N.W.2d 602.

¶28 Based on these legal standards, I first address whether the State has shown, based on the totality of the objective circumstances, that a reasonable person in Ofte's position would have believed that he was "at liberty to terminate the [interrogation] and leave," and then address whether State has shown that "'the relevant environment'" did not present "'the same inherently coercive pressures as the type of station house [interrogation] at issue in *Miranda*.'" *See Bartelt*, 379 Wis. 2d 588, ¶¶33, 35 (quoted source omitted). Many of the same facts are relevant to both components of the "in custody" determination.

*Freedom-Of-Movement*

¶29 To begin, some of the circumstances regarding Ofte's interactions with law enforcement before Deputy Paulson placed him in the squad car bear on the freedom-of-movement analysis during the interrogation at the squad car. The deputies accompanied the unsteady Ofte from the back of the ambulance, walked him up some sort of hill, and then "placed" him in the squad. Paulson then "imped[ed]" him from leaving the car for purposes of interrogation. It is unclear from the evidence how long a walk it was from the ambulance to the squad car. But the State fails to point to evidence that Ofte would not reasonably have perceived that this directed walk, accompanied by the deputies, could have contributed to a shift in his status from functionally not arrested to functionally arrested. *See Dobbs*, 392 Wis. 2d 505, ¶54; *Gruen*, 218 Wis. 2d at 595 & n.5 (movement of defendant to another location weighs in favor of "in custody"

12

status). Having already been questioned at the ambulance, when he made significant admissions and displayed strong indicia of intoxication, it would have been reasonable of Ofte to think that the next step was a move to a police vehicle for an arrest.

¶30 Notably, the State fails to direct me to evidence from the evidentiary hearing that could support an argument that, when Paulson testified that he "informed Mr. Ofte that my squad [car] was parked more up towards the hill and that we *had to* walk up towards my squad car," that Ofte should have understood this to be anything other than a command. (Emphasis added.) At least so far as the evidence here shows, a reasonable person in Ofte's position would have interpreted "had to" to mean "must," coming from a uniformed and armed police officer, accompanied by another uniformed and armed officer, both of whom had recently arrived on the scene in squad cars with emergency lights flashing.

¶31 As for Paulson's testimony that he "eventually placed [Ofte] in the back seat of my squad car," the State fails to direct me to evidence that could support an argument that this meant anything other than that Paulson physically held onto one or more parts of Ofte's body, or at least directed him with commands or gestures, to make clear to Ofte that he was required to enter the squad car. There are a limited number of ways to "place" someone in the back of a squad car, particularly a person who cannot keep his balance when trying to walk. Further, the circuit court appeared to interpret the evidence this way, and the State does not explain why this interpretation was clearly erroneous. The State merely asserts, "Ofte was never ordered or demanded by law enforcement to get into the back of the police vehicle, he was asked to get into the vehicle." I reject as undeveloped whatever argument the State attempts to make.

¶32 On a related note, it counts in favor of "in custody" status that Ofte was interrogated in a police vehicle, as opposed to while he was in his own vehicle, or perhaps while standing near his vehicle. *See Dobbs*, 392 Wis. 2d 505, ¶54; *Gruen*, 218 Wis. 2d at 595 & n.6. More generally, by informing Ofte that the deputies were going to take him to another location for field sobriety testing, then placing him in a squad car, and holding him in an "imped[ed]" fashion, they clearly signaled that this was not what the U.S. Supreme Court has explained is "an ordinary traffic stop," one in which the detained motorists expects that detention will be "temporary and brief." *See Berkemer v. McCarty*, 468 U.S. 420, 437-38 (1984) ("A motorist's expectations," in a routine traffic stop, are that the motorist will be detained only "a short period of time" while the officer pursues the mission of the stop, and therefore "questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek."); *see also Dobbs*, 392 Wis. 2d 505, ¶59 ("A brief detention, such as a traffic stop, typically does not rise to the level of 'custody' for purposes of *Miranda*." (citing *Berkemer*, 468 U.S. at 437-40)).

¶33 The circuit court had a basis to find that Paulson's specific testimony that he told Ofte that "we were going to a flat surface to perform field sobriety tests" at the close of the interrogation at the squad car was consistent with a generally commanding approach that Paulson took in his interactions with Ofte, starting from the moment that the deputies first questioned him at the ambulance. For example, Paulson testified that, during his encounter with Ofte at the ambulance, Paulson told Ofte that he "was *going to want to* run him through field sobriety tests," which describes a direction not a request. Similarly, by Paulson's

own account, he presented the trip to the "flat surface" for field sobriety testing as something that Ofte was required to do, not as a proposal.

¶34    Also highly significant is the undisputed fact that Paulson never told Ofte at any point before or during the interrogation at the squad car that he was *not* under arrest.  *See Dobbs*, 392 Wis. 2d 505, ¶64.  Further, there is no evidence that Paulson ever told Ofte that he could end the interrogation any time, which is a relevant although not dispositive consideration.  *See Halverson*, 395 Wis. 2d 385, ¶33; *see also United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) ("The most obvious and effective means of demonstrating that a suspect has not been" subjected to custodial interrogation "is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will.").

¶35    One factor that does not appear to weigh significantly in either direction is the number of officers involved in the encounter and interrogation. The U.S. Supreme Court has observed that, at least in "an ordinary traffic stop," "[t]he fact that the detained motorist typically is confronted by only one or at most two police [officers] further mutes [the motorist's] sense of vulnerability." *Berkemer*, 468 U.S. at 438.  But I have explained why the circuit court had a basis to find that a person in Ofte's position would not have experienced this as an ordinary traffic stop.  For example, the evidence suggests that both deputies, who arrived in separate squad cars, generally directed their attention to Ofte during the encounter; Ofte was apparently the only witness or suspect on the scene to occupy the attention of the deputies.  The two deputies were readily able to, and after encountering him at the ambulance did, completely control Ofte's locations and movements.

¶36 Turning to the length of interrogation factor, it is true that the interrogation at the squad car lasted only two to 30 minutes, probably closer to two minutes. This in itself weighs against "in custody" status. *See Halverson*, 395 Wis. 2d 385, ¶32*; Dobbs*, 392 Wis. 2d 505, ¶¶62-63. At the same time, however, based on the evidence presented at the hearing, Ofte would have had no idea how long the deputies would hold him in the squad car for interrogation. Custody status has been found to exist during relatively brief interrogations when the detained person "is aware that questioning will continue until he [or she] provides … interrogators [with] the answers they seek." *See Berkemer*, 468 U.S. at 438. Here, the circuit court had a basis to find that Paulson conveyed in his testimony that this was not a brief investigatory interview, but instead an interrogation intended to challenge Ofte's earlier statements to the deputies. Paulson pressed Ofte about inconsistencies, suggesting an adversarial grilling that is different in kind from the brevity and simplicity of the "three short, general, common-sense investigatory questions" at issue in *Gruen*, 218 Wis. 2d at 597-98 ("'What happened?,' 'Oh, so you were driving, then?,' and 'Well, then who was driving?'").

¶37 This last point relates to the purpose-of-the-interrogation factor in the test. *See Halverson*, 395 Wis. 2d 385, ¶30. This weighs in favor of "in custody" status. The evidence is that Paulson essentially explained to Ofte that he was not satisfied with Ofte's initial version of events given at the ambulance, and for this reason he had brought Ofte up to the squad car to grill him on the drinking and impairment topic. Thus, the circuit court could have reasonably determined that the purpose of the interrogation, as conveyed to Ofte, was to use a confrontational approach to get him to give different answers, in contrast to presenting neutrally framed questions such as, "Oh, so you were driving, then?"

¶38 It is true that there is no evidence that Ofte was ever frisked, handcuffed, nor was there evidence that either deputy ever drew or otherwise displayed a gun or other weapon. These indicia in themselves count against "in custody" status. However, it is also true that, from the start of the encounter at the ambulance, Ofte admitted to extensive drinking and displayed obvious signs of intoxication, and that he had trouble keeping his balance in trying to walk. Under these circumstances, it would have been reasonable for Ofte to assume, based on the totality of the circumstances, that the two deputies would not have had concerns that he might attempt to flee or resist if he had a status equivalent to that of a formally arrested person—no need for handcuffs or weapons, even if Ofte was in what amounted to arrest status. In contrast, when a suspect is seemingly unimpaired, the failure to handcuff or display weapons would typically be more significant as indicia of equivalent-to-formal arrest status.

¶39 It is also true that the walk from the ambulance to the squad car occurred out in the open, with the squad car presumably pulled over on the side of the road and thus visible to any passing motorists on the highway, which is a setting less completely "police dominated" than an interrogation in a windowless room in a police station. *See **Berkemer***, 468 U.S. at 438-39 (in "the typical traffic stop," the motorist does not "feel[] completely at the mercy of the police," because the stop occurs in "public, at least to some degree," due to the presence of potential witnesses in the form of "[p]assersby, on foot or in other cars," which "reduces the ability of an unscrupulous police [officer] to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if [the motorist] does not cooperate, he [or she] will be subjected to abuse."). However, a reasonable person in Ofte's position would not have considered motorists passing by on the highway, on a cold, windy evening, to be a significant check on

17

overbearing or improper conduct by the deputies. As far as the evidence reveals, a reasonable person in his position would have thought that he was "guarded by armed law enforcement," *see **Dobbs***, 392 Wis. 2d 505, ¶61, and that the deputies considered themselves free to interrogate him at the squad car indefinitely because he was not free to leave.[9]

## *Environment*

¶40 Based on many of the same facts referenced above, I conclude that the State fails to show that Ofte's environment, or specific circumstances, at the time of the interrogation did not "'present[] the same inherently coercive pressures as the type of station house questioning at issue in ***Miranda***.'" *See **Halverson***, 395 Wis. 2d 385, ¶¶17, 34-35 (quoting ***Howes v. Fields***, 565 U.S. 499, 509 (2012); *see also **Bartelt***, 379 Wis. 2d 588, ¶33, ("In other words, we must consider

---

[9] While the State does not make the argument, for the sake of completeness I note one additional potential factor that could weigh against "in custody" status, depending on the circuit court's assessment of relevant evidence. There was unrebutted evidence that this was a cold, windy evening in April and also that Ofte was unsteady on his feet. Could a reasonable person in Ofte's position have viewed Paulson's decision to place him in the squad car not as an attempt to limit his freedom of movement, but instead merely or at least mostly as an act of kindness or a safety measure to protect him from the elements? *Cf. **State v. Gruen***, 218 Wis. 2d 581, 596, 582 N.W.2d 728 (Ct. App. 1998) (the fact that officer asked defendant if he wanted to have a seat in police van because of the cold, weighed against "in custody" status). The problem for the State here, however, even beyond failing to make any such argument, is that the circuit court was not obligated to find, based on all of the evidence including the body camera video, that this would have been the reasonable understanding of a person in Ofte's position. For example, there is no evidence that the deputies extended courtesies to Ofte, expressed safety concerns, or made references to getting out of the cold. Thus, I am left to assume, in favor of the circuit court's ultimate decision, that the evidence would not support a finding that a person in Ofte's position reasonably should have understood that he was "placed" in the squad merely or mostly for the purpose of getting him out of the cold. *See **State v. Echols***, 175 Wis. 2d 653, 672-73, 499 N.W.2d 631 (1993) (we may assume that circuit court made a finding that is necessary to support a decision even when the circuit court is silent on the topic).

whether the specific circumstances presented a serious danger of coercion." (also citing *Howes*)).

¶41    First, the State does not offer a developed argument on this environment topic, and while my review of the legal issue is de novo the State bears the burden of proof. This court does not develop arguments for parties.

¶42    Second, recapping the specific circumstances regarding the environment or specific circumstances, Ofte's freedom of movement was severely restricted during the interrogation at the squad car entirely due to the unambiguous actions of Deputy Paulson, with backup from the second deputy. After encountering him at the ambulance, the deputies controlled Ofte's movements and locations, directing him to the unfamiliar and intimidating environment of a squad car, but did not tell him that he was not under arrest nor did they tell him that he was free to terminate the interrogation. In short, while the deputies did not take him into a police station room, they created an accusatory "police setting" with the same natural effects. So far as the evidence reveals, Paulson's words and conduct in interacting with Ofte would have led a reasonable person in his position to believe that he was obligated to answer as many questions as Paulson wanted to ask him as long as the deputies decided to hold him in the back of the squad car.

¶43    For all these reasons, I conclude that the State fails to show that the protections afforded to Ofte under *Miranda* did not apply from the start of the interrogation at the squad car, and I affirm the circuit court's ruling to that effect. As noted above, the State has abandoned on appeal any challenge to the court's applications of the exclusory rule to particular categories of evidence.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.